STEVEN SCHMELZER

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

FRIENDS OF BLUE MOUND STATE PARK,

Plaintiff,

vs. Case No. 21CV676

WISCONSIN DEPARTMENT OF NATURAL RESOURCES, et al.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Deposition of STEVEN SCHMELZER

Wednesday, June 1, 2022

8:56 a.m. to 11:56 a.m.

Reported by Jennifer M. Steidtmann, RPR, CRR, CRC

JOB NO. 209973

A P P E A R A N C E S

FOR THE PLAINTIFF:

PERKINS COIE LLP
BY: Brian Potts, Esq.
Juan Angel, ESQ.
33 East Main Street
Madison, Wisconsin 53703

FOR THE DEFENDANTS:

WISCONSIN DEPARTMENT OF JUSTICE
BY: Gesina Carson, Esq.
17 West Main Street
Madison, Wisconsin 53707

I N D E X

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| STEVEN SCHMELZER | | |
| | EXAMINATION BY MR. POTTS | 4 |

E X H I B I T S

| NUMBER | | PAGE IDENTIFIED |
|---|---|---|
| Exhibit No. 58 | E-mail correspondence | 43 |
| Exhibit No. 59 | Confidential notes | 46 |
| Exhibit No. 60 | E-mail correspondence | 91 |
| Exhibit No. 61 | E-mail correspondence | 94 |

(Original exhibits attached to original transcript; copies provided to attorneys ordering exhibit copies.)

P R E V I O U S L Y   M A R K E D   E X H I B I T S

| NUMBER | | PAGE IDENTIFIED |
|---|---|---|
| Exhibit No. 4 | E-mail correspondence | 37 |
| Exhibit No. 8 | Policy brief | 46 |
| Exhibit No. 23 | E-mail correspondence | 83 |
| Exhibit No. 24 | E-mail correspondence | 85 |
| Exhibit No. 25 | E-mail correspondence | 89 |
| Exhibit No. 47 | Interrogatory responses | 57 |

TRANSCRIPT OF PROCEEDINGS

STEVEN SCHMELZER, called as a witness herein, having been first duly sworn on oath, was examined and testified as follows:

EXAMINATION

BY MR. POTTS:

Q Good morning.
A Good morning.
Q How are you doing today?
A Good.
Q Can you just -- I'm going to start with some introductory questions.
What is your full name?
A Steven John Schmelzer.
Q And can you spell the last name?
A Sure. It's S-C-H-M-E-L-Z-E-R.
Q Okay. And what is your address? And work is fine.
A 101 South Webster, Madison, Wisconsin.
Q Okay. And are you taking any medications that would affect your ability to testify truthfully today?
A Some allergy stuff, but I don't think that will impact it.
Q Okay. Have you ever been deposed before?
A Yes.

Q And about how many times?
A Once, I believe.
Q Okay. And can you tell me about that case?
A It was with a use of force incident that I was a trainer for, had a staff member that had been sued, and so I testified -- or a deposition for that.
Q Okay. And did you also testify in court for that?
A No. It -- it never went any further.
Q Okay. Any other times you've testified in court or been deposed?
A A number of times in court.
Q Okay. And can you sort of go through those?
A I think the last time I testified was probably 12 -- 10-12 years ago, so it's -- I can't think of the specific cases. It was probably 10 or 12 specific cases, but I also was court officer for probably five to seven years, so I was in court at least monthly if not more often.
Q And what were those cases generally about?
A Most of them were civil forfeitures. Occasionally there was criminal cases, but those would be -- follow the regular criminal procedure, so that's usually when I testified in cases.
Q And why were you testifying?

A As either arresting officer or a backup officer.
Q I see. Are you --
A Or trainer.
Q Okay. Well, so were you a police officer in some form?
A Yes.
Q I see. And do you understand you're under oath today and must testify truthfully?
A Yes.
Q Do you understand that that oath is just as binding today as it would be if we were sitting in the courtroom?
A Yes.
Q Now it sounds like you've done this before, but please remember that you must answer all questions audibly so that the court reporter can take down your answers.
A Right.
MS. CARSON: You don't need to take notes.
BY MR. POTTS:
Q And please remember to give verbal responses, no head nods, and we should do our best to avoid talking over each other because it's hard for the court reporter to write down two people talking at once.

And finally along the same lines, if I ask you a question, try to let me finish the question before you answer, and I'll do the same with you.
If you don't understand a question I ask, do you understand that you can ask me to clarify the question?
A Yes.
Q Okay. So it's fair to say that if I ask you a question and you answer, that you understood that question?
A Yes.
Q How did you prepare for this deposition today?
A With my attorney.
Q Other than discussions with your attorney, did you review any documents?
A I -- the interrogatory, I took a look at that, and the other exhibits.
Q Which other exhibits?
A Yeah, there's a whole -- there was two different packets of them that I -- that I paged through.
Q Okay. Did -- so just to clarify for the record, you paged through the previous deposition exhibits?
A Yes.
Q And did you review anything else in preparation for

the deposition?
A I think that's pretty much -- that's pretty much it. I mean, I've looked at my calendar but, yeah, I think that's been it.
Q Did you review any other deposition transcripts from this proceeding?
A No.
Q Did you talk to anyone else who has been deposed so far in this proceeding?
A In passing. I knew that they had -- or they told me that they had their deposition, but that was pretty much it.
Q Okay. So you didn't discuss in detail any of -- anyone else's answers --
A No.
Q -- during their depositions?
Sorry. You got to let me finish. It's hard. So you can answer the question now.
A No.
Q Thanks. Other than the exhibits, and it sounds like the -- you looked at your calendar, did you review anything else in preparation for the depositions?
A No.
Q Okay. Could you please summarize your educational

background?
A I have a Bachelor of Science in natural resources and recreation resource management from University of Wisconsin-Madison.
Q Okay. Any other education beyond the Bachelor of Science?
A No.
Q And it sounded like you were previously a police officer. Did you have to do training for that?
A I was a park ranger and park superintendent.
Q Oh, I see. And what's the -- I mean, what does that job entail?
A The -- the training or the specific -- the job?
Q How about both.
A Okay. The training consisted -- I believe at the time it was a 400-hour Department of Justice mandated training course, and then you have yearly updates of that. I think it's 24 hours per year. Then I was a credential officer for 25 years.
Q Sorry, could you say that again?
A I was a credential law enforcement officer for 25 years until there was periodic updates, and then I did periodic other trainings, 20 or 30 other trainings, you know, from leadership to interviewing,

interrogation. I was a defense and arrest instructor, a firearms instructor. So, you know, quite a bit of primarily law enforcement training.
Q And -- but it sounds like you weren't actually a police officer; is that correct?
A We -- we have full arrest powers, full credentialed law enforcement powers.
Q And that's I -- I guess what was the job title then?
A Park ranger and then park superintendent, assistant superintendent.
Q Okay. And so -- and a park ranger effectively has the same powers as a police officer?
A Yes, sir.
Q Okay. And do all park rangers have to have that training to your knowledge?
A Not anymore.
Q Okay. And what changed? Or I guess if you could just explain probably would be the fastest.
A Department of Natural Resources transitioned to have conservation wardens cover all the law enforcement.
Q Okay. And so nowadays park rangers don't necessarily have to also have police officer training?
A That's correct.
Q And what is a conservation warden?

A They enforce fish and game and boating, that was their primary job responsibility, but they came and worked on recreational properties starting in 2018.
Q Okay. So the conservation wardens effectively took over for the police officer portion of the park ranger duties?
A Yes.
Q And that was -- happened in about 2018?
A Yes.
Q And I think you said roughly 25 years, but can you just go through your professional employment after graduating from UW-Madison?
A I started as a limited term employee park ranger. I did that for -- in 1992 and '93, and then I was hired as a permanent seasonal park ranger. I did that until late '99, early 2000. And I was hired as an assistant property superintendent, and I did that until 2008. And then I was the park superintendent. I did that until 2019. And then after 2019, February of 2019 I was the Southwest District Park Supervisor. And then July of last year I was promoted to the -- be the Director of Wisconsin State Parks.
Q And when you were a park ranger, you were a park ranger at a lot of different parks, or were you

focused on just certain parks?
A I was at primarily Devil's Lake State Park, but also covered Natural Bridge State Park, and then later on Sauk Prairie State Park Recreation Area. I did help out at some other properties and, you know, other law enforcement kind of things that happened. I was at the capital in 2010-2011.
Q Okay. So -- but your primary responsibilities were related to Devil's Lake and the parks near -- parks and state properties near Devil's Lake?
A Yes.
Q Did you ever serve as a park ranger at Blue Mound State Park?
A No.
Q Until you took over as the Director of the Wisconsin State Parks, did you have any job responsibilities related to Blue Mound State Park?
A I was a southwest park district supervisor.
Q Okay. And --
A And Blue Mound is in -- within that district.
Q I see. And can you remind me again what years you did that?
A Started in February of 2019 until 2021.
Q Okay. So is it fair to say that prior to February of

2019, you had no or very limited involvement with Blue Mound State Park?
A That's correct.
Q And are you still -- and are you still a police officer?
A No.
Q And when did you let that lapse, so to speak?
A 2018.
Q 2018, I see. And was that when you were promoted to a position that didn't require it?
A No.
Q Or was that because the conservation warden change?
A Yes.
Q I see. Do you hold any certifications?
A Not at this time.
Q In the past, other than the police officer related certifications, do you hold -- have you held any other certifications?
A Pesticide application.
Q Anything else?
A Scuba certified.
Q Okay. Anything else?
A No.
Q Have you had any training or schooling as a lawyer?

STEVEN SCHMELZER

A No.
Q Okay. So I believe you said you took over as the Director of Wisconsin State Parks in 2021; is that correct?
A Yes.
Q Do you remember roughly when in 2021?
A I believe it was July 12th.
Q And what does the Director of Wisconsin State Parks do?
A General overall management and operations of Wisconsin state parks, trails, forests.
Q And roughly how many employees are under you in that position?
A Approximately 200 full-time equivalent employees, and that varies depending upon vacancies, which is always -- you know, people are retiring and coming and going, and then up to 500 limited term employees.
Q Okay. And are those mostly park rangers?
A No.
Q Okay. What are the sort of -- and I don't need you to list all 200, but what are the -- I am just trying to understand the structure of the state park system and who would report to you.
A My direct reports you're asking about?

STEVEN SCHMELZER

Q Yeah, I guess. Sure. We could start there.
A Okay. My direct reports would be the section supervisors, so we have a partnership section supervisor, we have an operations section supervisor, a business supervisor, and then also a policy supervisor.
Q And it -- does Missy Vanlanduyt -- hopefully saying her name correctly.
A Vanlanduyt.
Q Vanlanduyt. Does she report to you?
A Yes.
Q And what is her role?
A She's the communication and partners -- partnership section supervisor.
Q Okay. So she's one of the section supervisors that is your direct report?
A Yes.
Q And I'm sorry, could you say her title again, communications --
A Communications and partnership section supervisor.
Q Who is currently the director -- the Southwest Director of State Parks?
A Brian Hefty is acting in that position.
Q And did he take over after you were promoted?

STEVEN SCHMELZER

A Yes. He -- he's a supervisor for that position, so he took on those additional responsibilities.
Q I see. So he's also a section supervisor?
A Yes.
Q And what's his section that he supervises?
A He supervises the district supervisors.
Q That's a lot of supervisors. So what are the district supervisors?
A Each part of the state has an area of responsibility and a section of the state, and those are the district supervisor.
Q I see. So the southwest would have been the southwest district supervisor, which he is supervising in his role; and so since there's no one there, he's acting as that supervisor?
A Yes.
Q Okay. But from a practical perspective, Brian Hefty and Missy Vanlanduyt are at the same managerial level in the department?
A No.
Q Okay. How are they different?
A He -- Brian Hefty is also the deputy director.
Q So Brian Hefty is the deputy director directly under you?

STEVEN SCHMELZER

A Yes.
Q And he also holds one of the section supervisor roles?
A Yes.
Q Is there any other -- so he's sort of number two below you?
A Yes.
Q I see. And is there anyone else at his -- at Mr. Hefty's level?
A Within -- within parks or --
Q Yeah, within state parks.
A No.
Q Okay. All right. I think I now understand the -- thank you for that. And sorry I don't know all the hierarchy inside the state parks division. So there's a lot of nomenclature.
Okay. So I think I understand sort of downstream of you, and now I'd like to understand upstream.
You're the Director of State Parks. Who do you report to?
A Diane Brusoe.
Q And what is her role?
A She's the deputy administrator for fish, wildlife,

STEVEN SCHMELZER

and parks division.
Q Okay. So she is basically number two in the fish and wildlife division?
A Yes.
Q And who is the actual administrator?
A It's vacant right now.
Q Okay. So --
A Keith Warnke was the prior deputy -- or was the prior division administrator.
Q I see. And where did -- where is Keith now?
A Retired.
Q Okay. And is Diane Brusoe acting as the division administrator in Keith's absence?
A She shares the responsibility with Tami Ryan.
Q And how do you spell that person's name?
A T-A-M-I, R-Y-A-N.
Q Tami, okay. And -- and who is Tami Ryan?
A She's also a deputy division administrator. Her responsibility is fish and wildlife.
Q So Ms. Ryan and Ms. Brusoe are both at the same level?
A Yes.
Q And -- but you only report to Ms. Brusoe?
A Yes.

STEVEN SCHMELZER

Q And then above Ms. Brusoe, since there's no division administrator, who would Ms. Brusoe report to?
A Deputy secretary.
Q And who is that?
A Sarah.
Q What's her last name, do you remember?
A Just escaped me for a second.
Q That's all right. I understand.
And is Sarah the deputy -- what's she the deputy secretary of?
A Of natural resources.
Q Oh, the whole department. So she's basically number two?
A Yes. Sarah Barry, I'm sorry.
Q Barry, okay. So she reports up to directly to Preston Cole?
A Yes.
Q And have you -- prior to taking over your current role as the Director of Wisconsin State Parks, have you worked with Ms. Brusoe?
A Yes.
Q And in what sense?
A When I was a district supervisor.
Q Okay. So when you were the southwest district

STEVEN SCHMELZER

supervisor?
A Yes.
Q And when you were the southwest district supervisor, which would have been from 2019 to 2021 I believe, how did you -- what was your role vis-?-vis Ms. Brusoe?
A Through usual meetings.
Q Okay. And was she your boss then, too?
A Yes. She was in the, you know, higher chain, and she was acting parks director for a short period of time, too.
Q So she was in your job for a little while?
A Yes.
Q Acting, okay.
And did -- had you worked with Ms. Brusoe prior to 2019?
A Yes.
Q And in what capacity?
A She was a -- a planner for the Department of Natural Resources.
Q And how did you work with her when she was a planner?
A With the Sauk Prairie State Park Recreation Area master plan.
Q Oh, okay. And this was back when you were at Devil's

STEVEN SCHMELZER

Lake?
A Yes.
Q And who is Todd Ames?
A He's the prior deputy secretary.
Q I see. So Todd Ames used to have Sarah Barry's job?
A Yes.
Q And when did that switch happen? Roughly, if you know.
A February.
Q Oh, so it's recent?
A Yes.
Q And February of 2022?
A Yes, sir.
Q And where is Mr. Ames now?
A Canoeing down a river.
Q Is he retired?
A Yes.
Q I see. Do you know which river?
A Wisconsin, probably.
Q Just kidding.
All right. All right. I believe you said Ms. Vanlanduyt -- I'm going to mess up her name again. Can you say it one more time?
A Vanlanduyt.

Q Vanlanduyt -- reports to you; is that correct?
A Yes.
Q And how long have you worked with Ms. Vanlanduyt?
A 10 years.
Q Okay. And why has it been that long? Like, how did you work together over the 10 years?
A She was a partnership and communications section supervisor, so working with her on different partnerships and agreements. And prior to that, she was also the capital development -- capital development coordinator for the state, so she administered all the development projects across the state.
Q And what does that mean? What is a development project?
A Fixing of buildings, new buildings, roads, trails.
Q So spending money at the parks?
A Projects, yes.
Q I see. Have you had a good working relationship with her?
A Yes.
Q And so you worked with her when she was a communications and partnership section supervisor, presumably both in your role while working at Devil's

Lake State Park and as the southwest state park supervisor?
A Yes.
Q Do you socialize with Ms. Vanlanduyt?
A No.
Q What about Ms. Brusoe?
A No.
Q So Ms. Vanlanduyt's communications and partnership section supervisor job. Could you describe generally what that entails?
A Communications and working on partnerships.
Q Is that only with friends groups?
A With -- for the whole program?
Q Well, I guess, could you just explain in more detail?
A She works with our office of communications, also providing news releases, meeting with the media.
Q I see. So it's sort of a -- both a public relations job and a job that involves interfacing with the friends groups and other partners --
A Yes.
Q -- to the parks?
MS. CARSON: Just wait until he finishes.
MR. POTTS: Sorry. You got to let me finish.

MS. CARSON: You're doing really good.
MR. POTTS: It's okay. It's really common.
BY MR. POTTS:
Q So in your role as Director of Wisconsin State Parks, do you need Ms. Brusoe -- Brusoe's approval to take action?
MS. CARSON: Objection. Vague.
MR. POTTS: I guess let me restate that.
BY MR. POTTS:
Q When did you need Ms. Brusoe's approval to take actions in your role as a Director of State Parks?
A I'm not understanding when you say take actions.
Q I guess I'm just trying to understand when you need to run something by Ms. Brusoe and get her approval and when you don't in your current role?
A I would say a lot of actions we meet -- we meet weekly and talk, you know, throughout the week. So anything that's of, you know, bigger significance or potential, you know, larger issue, I'll talk with her about.
Q So you meet weekly, sort of go through the projects and things you're working on --
A Yes.

Q -- that are of note? Now you can answer.
A Yes.
Q Is Ms. Vanlanduyt in those meetings?
A No.
Q So these are typically one-on-one weekly meetings?
A Yes.
Q And do you have similar meetings with your section supervisors?
A Yes.
Q And are those generally weekly?
A Yes.
Q How is your working relationship with Ms. Brusoe?
A Good.
Q You all get along pretty well?
A Yes.
Q And this same question with Ms. Vanlanduyt?
A Good.
Q As the director of -- well, let me ask you -- let's back up to when you were the southwest section supervisor. Did I get that right?
A District Park Supervisor.
Q Sorry, District Park Supervisor. Did you have a role in relation to the Blue Mound State Park master planning process?

A Very little.
Q Okay. And what was your role, even though it was very little?
A Kevin Swenson was the park manager, and he was the lead for the master plan, and -- and he reported to Kathy Grunzwell (phonetic) as she was the supervisor for that area, and my role consisted of basically they would just provide me an update of -- of where we were in the process.
Q Okay. So you didn't personally have any input into what went in the plan?
A No.
Q And in your current role, do you have any input in what goes into state park master plans?
A Yes.
Q But you took over your current role after the Blue Mound master plan had been completed; is that correct?
A Yes.
Q What is a friends group?
A Are you referring to a friends group that has a relationship with a specific property?
Q I guess just are you generally aware that there are friends groups in Wisconsin that are associated with

one or more state parks?
A Yes.
Q And I'm just trying to understand your general understanding of what a friends group is and what they do, et cetera.
A They exist to help the properties.
Q And from a practical perspective, what does that mean? Like, what are most of them doing?
A Raising funds, volunteering, sponsoring events.
Q And when they raise -- when one of these friends groups raise money, who decides -- well, let me back up.

If a friends group raises money, that money has to go to the park; is that correct?
A Yes. It's -- it's defined in the friends agreement.
Q Okay. And then I guess I'm trying to understand what the money is spent on at the park. Who decides how that money will be used?
A Usually you work with the park superintendent and then with the friends group.
Q Okay. So does the friends group have some say over how the funds are used at the park?
A To some extent.
Q And, I guess, could you just describe generally what

that process would be? Is it a negotiation between the park supervisor and a friends group?
A Yes.
Q And then do you -- do you approve the final expenditure decisions for the park for friends groups?
A Right now?
Q Yeah.
A No.
Q Is that the development supervisor role that we discussed earlier?
A It would depend upon the -- the level of -- of development. If it's a picnic table, no.
Q Okay.
A But --
Q And what's the level that would generally involve management?
A There's grants that are available to friends groups, so that involves an approval from both the district supervisor and the development coordinator.
Q And -- but those are -- those are external -- or those are DNR grants?
A Internal grants, yes.
Q That would go in addition to the funding from the

friends group?
A Yes. It's a match grant program.
Q I see.
A And many friends group projects utilize those.
Q Okay. And so the -- a friends group raises money to help the park, and then in consultation with the park supervisor helps to determine what those funds could be used for to improve the park; is that fair?
A Yes.
Q Do you know roughly how many friends groups there are like this in Wisconsin?
A Approximately 92.
Q Do you know of those, again roughly 92 friends groups, which -- which have raised the most money for their particular parks?
A I don't have that total.
Q Do you have a -- I mean, is -- where in the 92, roughly, do you think the Friends of Blue Mound --
A Oh, they're towards the top.
Q Okay. So they're one of the friends groups that raises the most money for their particular park?
A Yes.
Q Not necessarily number one understanding.
A Yes, yes.

Q Okay. Does Devil's Lake have a friends group?
A Yes.
Q And how -- presumably you worked quite a bit with that friends group when you were in your role -- roles at Devil's Lake; is that correct?
A Yes.
Q And how was your working relationship with that friends group?
A Good.
Q And has that friends group raised a significant amount of money for Devil's Lake?
A Yes.
Q In your relationship working with that friends group, has the friends group ever disagreed with the DNR about the uses of Devil's Lake State Park?
A You're talking about the Friends of Devil's Lake?
Q Yes.
A So can you state the question again, please?
MR. POTTS: Sorry. Can you read it back?
(RECORD READ.)
THE WITNESS: There was always discussions about it.
BY MR. POTTS:
Q I mean, were there any -- ever any significant

disputes?
A No.
Q Is there a snowmobile trail through Devil's Lake State Park?
A Yes.
Q And where does that trail go, roughly?
A Around Devil's Lake.
Q Is it on existing roads, or is it in an individual trail just for snowmobiles?
A Both.
Q Okay. And how long has that snowmobile trail been there, to your knowledge?
A More than 30 years.
Q Okay. Before your time?
A Yes.
Q And were you involved in the construction of the new snowmobile trail at the Sauk Prairie Recreation Area?
A A new trail?
Q Correct.
A The trail was moved slightly. I wouldn't classify it as a new trail.
Q Okay. Well, were you involved in the snowmobile trail at the Sauk Prairie Recreation Area?
A Yes.

Q In what -- in what way?
A The local snowmobile clubs and -- and volunteers would talk with me.
Q Okay. And what is your relationship with the -- or what has your relationship been with the snowmobile clubs over the years?
MS. CARSON: Objection. Vague.
Go ahead and answer.
THE WITNESS: Specific to Devil's Lake?
BY MR. POTTS:
Q Just in general. How often do you talk to -- or have you had conversations with snowmobile clubs over the years?
A Typically a couple times per year, unless -- unless there was a -- something needed more, you know, discussion.
Q Are you a member of any snowmobile clubs?
A No.
Q Do you ride snowmobiles?
A I have.
Q Do you own a snowmobile?
A No.
Q And how often do you ride snowmobiles?
A Very rarely. The last time was probably eight to 10

years ago when I was grooming ski trails.
Q And does the department own any snowmobile trails for -- that you know of? I mean, sorry, not trails.
Does the department own any snowmobiles that you know of?
A Yes.
Q And what are they used for?
A Primarily grooming of ski trails.
Q Okay. And you mean cross-country ski trails?
A Yes.
Q What -- again going back to your role -- well, strike that.
It sounds like you have had significant experience working with friends groups; is that fair to say?
A Yes.
Q And how does the DNR supervise friends group activities?
A I don't know if they would qualify as supervision. You work with your friends groups, you know, on events and volunteers, so I don't know if that's -- would be supervision. It's more of a work together.
Q Does the DNR ever serve as a board member on any of the friends groups?

STEVEN SCHMELZER

A No. They're not allowed to.
Q By not allowed to, do you mean -- what do you mean by that? Who doesn't allow you?
A No, we don't.
Q Okay. And is it your understanding that it's not allowed by department policy?
A Yes.
Q And who do you -- is it common for department employees to attend friends group board meetings?
A Yes.
Q How often does that occur in your experience?
A Fairly often.
Q And when you were at Devil's Lake, did you attend the Devil's Lake friends group board meetings?
A Yes.
Q And roughly how often? Every board meeting? Every other board meeting? A few a year?
A Most board meetings.
Q Okay. But the DNR again doesn't have a vote on any friends group boards that you're aware of?
A Not that I'm aware of.
Q Have you ever attended a Blue Mound friends group board meeting?
A No.

STEVEN SCHMELZER

Q Do you know any of the -- do you know personally any of the Blue Mound's friend group board members?
A Is Karl Heil on the -- then it would be yes.
Q Yes, Karl Heil's on the board.
Okay. And how do you know Karl?
A Working with him while he was the -- at Blue Mound State Park.
Q Okay. And was this when -- in your role as southwest --
A No. I was never his supervisor.
Q Oh, I see. So when you were working at Devil's Lake, he had a similar role at Blue Mound State Park?
A Yes.
Q And how was your working relationship with Karl?
A Fine.
Q Did you ever have any issues with him when he was the head of Blue Mound State Park?
MS. CARSON: Objection. Vague.
BY MR. POTTS:
Q Was your -- did you have a good working relationship when he was head of Blue Mound State Park?
A Yes.
Q Do you know why Mr. Heil is no longer the head of Blue Mound State Park?

STEVEN SCHMELZER

A No.
Q But when you were the southwest district -- southwest division supervisor -- did I get that right this time? Closer?
Did you supervise -- did you -- was Mr. Heil still in his position?
A No. He had left.
Q Other than Mr. Heil, do you know any other board members of Blue Mound's friends group?
A I met with Willi and Greg.
Q But other than the professional meetings --
A No.
MS. CARSON: Just wait.
MR. POTTS: Sorry.
BY MR. POTTS:
Q Okay. And we'll come back to the meeting. Actually, let me ask you:
Was that the first time you had met Willi and Greg, that meeting on August 5th?
A Yes.
Q Have you ever spoken with Timm Speerschneider?
A Yes.
Q And what about?
A Snowmobile trails.

STEVEN SCHMELZER

Q Have you ever spoken with him about Blue Mound State Park?
A No.
Q Are -- do you have a relationship with Mr. Speerschneider outside of your work at the department?
A No.
MR. POTTS: So I'm going to refer you to what has already been marked Deposition 4.
MS. CARSON: Probably easier just to hand him the book.
MR. POTTS: Yeah, right. And he can just flip to whatever one he wants, and you can -- while he's -- why don't we take a couple-minute break.
(Break taken from 9:45 a.m. to 9:49 a.m.)
BY MR. POTTS:
Q Okay. Looking at Deposition Exhibit 4, do you recognize this chain of e-mails?
A Yes.
Q And could you generally describe what's going on in the e-mails?
A Open records request.
Q On it looks like the first e-mail where you are looped in is on the bottom of the second page for

Ms. Durrant on August 19, 2021 at 10:33. Do you see that e-mail?
A Yes.
Q And Ms. Durrant is the public records -- is in charge of this public records request and collecting the documents; is that a fair assessment of her position?
A Yes.
Q Have you worked -- had you worked with Ms. Durrant before this e-mail?
A I don't believe so.
Q Okay. And Ms. Durrant in the e-mail on August 19th is e-mailing a copy of the friends groups' e-mails, and she says in bold, Missy and Steven, could you let me know if you have any e-mail records for this request.
And then Ms. Vanlanduyt responded, again with you on the chain, I do have e-mails -- I'm sorry -- I do have e-mail records of this. And then the next e-mail is Emily saying, could you please add those e-mails to the folder below. Again, you're copied. And then on August 20th you responded, Emily, I uploaded a number of items to the folder. Some of the items include e-mails from our department legal staff so I'm guessing those would not be

released. Let me know if you have any questions.
In the documents you uploaded to the folder, were there -- how did you go about searching for those documents?
A I think I used the terms that were in the request.
Q And you mean the keyword Blue Mound friends group, friends agreement, those terms?
A Yes.
Q And did you just effectively go to your e-mail box and search for those terms?
A Yes.
Q And then after you went to your e-mail box and searched for those terms, you presumably found some documents that you thought were potentially responsive and uploaded those documents?
A Yes.
Q Were there any documents that you did not upload that had those terms in them?
A Not that I'm aware of.
Q So you didn't purposefully keep any documents -- documents out?
A No.
Q Okay. Did you review what Ms. Vanlanduyt uploaded to the folder?

A No, I don't -- I don't believe I did.
Q Okay. So you effectively got this e-mail from Ms. Durrant, searched your e-mail box for the words, and then put all the documents that had those words in this folder; is that a fair summary of what occurred?
A Yes.
Q Did you have any additional role with regards to this particular public records request?
A No.
Q Did you re-review all the documents that you uploaded prior to uploading them?
A Yes, I probably looked at them.
Q But again, you included all the documents you found?
A Yes.
Q Did you talk to Ms. Vanlanduyt about this document request back in August of 2021?
A Probably.
Q Do you remember what you would have talked about?
A To make sure that -- that we were uploading the documents.
Q But did you ever compare the documents you uploaded to those that she uploaded?
A No.

Q Let's see. Did you attend any training regarding responding to public records requests?
A Yes.
Q And could you describe how often and what that training entailed?
A I believe we do it yearly, just basically go over what -- what the procedure you should do.
Q And did you follow the procedure in this case?
A As far as I know.
Q And what is the general procedure that they train you to follow?
A When records are asked for, we provide -- provide the records.
Q That is -- anything else in the training?
A I mean, I can't quote the whole training, but that -- in essence that's what it is.
Q Okay. So even if it says draft on it, you're supposed to provide the record?
A The -- I mean, what -- I think the -- there's some things that aren't included with that.
Q Like what?
A If I remember correctly, if it's like, you know, notes that you take or a draft that's, you know, still in progress, I believe.

Q But is it your understanding that that's your determination to make or other people at the department who are in the public records section?
A Both, I believe.
Q Okay. So do you remember if here there were any documents that were notes or drafts that you did not include in the folder?
A I don't believe so.
Q Same question with privileged and confidential information. It looks like based on the e-mail you did put some e-mails with -- or documents that had lawyers on them in the folder.
Is it fair to say that even if it had lawyers on them, you put them in the folder?
A Yes.
Q Did you have any discussions with Ms. Durrant other than this e-mail chain about what should or shouldn't be produced?
A I don't think so.
Q You never had any phone calls or other meetings with her about this request?
A Not that I recall.
MR. POTTS: Can I have Exhibit I? Although is this already an exhibit?

MR. FONSECA-ANGEL: I don't think so, not --
MR. POTTS: Oh, not with the last two, yeah. Yeah, we'd like to introduce this as Exhibit 58.
(Exhibit 58 marked for identification.)
BY MR. POTTS:
Q I'll walk you through the exhibit, sort of starting with the back. It looks -- again, the first e-mail in the chain is a request from Mr. Hubbuch, who's a madison.com reporter to the DNR, and then it looks like the first e-mail where you are copied is on September 1, 2021, which is on page 4 at the bottom, and in this case Ms. Bernaski -- who is Ms. Bernaski?
A She's a department employee.
Q I know that. I mean, like, what's her role, do you know?
A She's an LTE program assistant within the Bureau of Parks and Recreation.
Q Okay. And so she is it looks like passing on an -- the e-mail from Ms. Durrant with the public records request, and it says the following open records request was submitted for records, and then there's a paren or a quote, referencing termination of

operating agreements with friends groups since 2010, and then it -- she sent that e-mail on Wednesday, September 1st at 3:56, and you responded a couple days later on Friday saying, Emily, I have two records that would be part of this.
Do you see that?
A Yes.
Q And what process did you use to search for documents in this -- with this public records request?
A Probably the same way I did the other one.
Q Okay. In this case, though, there's not sort of terms listed. Would you have just searched for termination, or do you remember?
A That's -- that's what I likely did.
Q Okay. And you said, I have two records that would be part of this; and then Ms. Durrant responded, could you please place those records into the following folder; and then you say, Emily -- and this is on September 3rd -- I added an item to the folder. The other was labeled as confidential notes so I didn't include that one.
Do you see that?
A Yes.
Q Did you ever talk to Ms. Durrant about whether or not

those confidential notes should be provided?
A I don't recall if I did or not.
Q Did you ever provide those confidential notes to Ms. Durrant?
A It says here that I didn't include that one, so I'm guessing I didn't.
Q Okay. But you don't remember?
A No.
Q Do you remember what was in those confidential notes?
MS. CARSON: I'm going to object to the extent you're asking him to summarize something that might be an attorney-client privileged communication.
Other than that, you can answer.
THE WITNESS: Probably the meeting notes.
BY MR. POTTS:
Q You mean the -- did you take notes during the August 5th meeting? I guess, what meeting notes are you talking about, or could you describe what they would be?
A The -- like the draft topics to cover.
(Discussion held off the record.)
(Exhibit 59 marked for identification.)
BY MR. POTTS:

Q All right. I'd like to hand you what we will mark as Exhibit 59. I'm trying to refresh your recollection here.

This is a document that you can assume, take my word for, was produced by Ms. Durrant in response to Mr. Hubbuch's request. Is this the confidential notes you're discussing that you didn't include?

A Yes, I believe that's what it is.

Q So I'm -- I guess I'm confused. So Exhibit 59 was produced by Ms. Durrant in response to this records request.

Did you put Exhibit 59 in the folder?

A I'd have to look and see. Maybe -- I'd have to look and see. I guess I don't know. You know, based upon the -- this e-mail here, this may have been the one that I left out, but maybe Missy sent this one in.

Q I'm going to hand you the notes as Exhibit 7 on it. It's actually Deposition Exhibit 8. Oh, yeah, there you go.

And on page -- could you look through Exhibit 8 and see if that refreshes your recollection regarding what you added to the folder and what you didn't add to the folder?

A Okay.

Q And after -- after reviewing that, do you remember now what you added to the folder and what you didn't add to the folder?

A Yeah. It was likely the -- the -- the draft briefing sheet that was being worked on, and then e-mails that went along -- went along with that.

Q You mean the briefing sheet that has redlines in it, track changes?

A Yeah, there is a couple different ones in here. It was likely the e-mails that went along with that and that.

Q Okay. And to just cut to the chase, are there any other confidential notes other than the ones you see in Exhibit 8 that you're aware of that you have in your possession that weren't produced?

A No.

Q Okay. So you believe Exhibit 8 includes now the confidential notes that you decided not to include at the time?

A Yes. The only ones that I believe are in question are the ones you have here.

MS. CARSON: Just -- can you refer to page numbers when you're talking about that?

THE WITNESS: DNR 009531.

BY MR. POTTS:

Q Okay. And I guess I'm confused. So are you saying the confidential notes are DNR -9531 and -9532, or are the -- the ones that have the track changes in them, -9536?

A -9531.

Q Okay. So why -- what about -9531 do you believe is confidential?

A They were Missy's notes.

Q Is Missy a department employee?

A Yes.

Q And are department employee notes confidential?

A I guess it would depend upon what -- what level they -- I mean, I wasn't sure. I think that's when I asked Emily that, I think that she had indicated that maybe you wouldn't have to include those. So I wasn't sure about that, but obviously maybe Missy added these and they've been released so you have them. That would have been what it was referring to.

Q Well, this is in response to Chris Hubbuch's request, not ours.

A Okay. Or Chris's request, yes.

Q I guess on page -- on the e-mail on page 2 of

Exhibit 58, the new one I just gave you --

A This one?

Q This one.

MS. CARSON: Does that have an exhibit sticker on?

THE REPORTER: I have them over here.

MS. CARSON: Could we have the witness look at the one with the exhibit sticker? I just want to be sure.

MR. POTTS: Yeah. Yeah, that's fine.

BY MR. POTTS:

Q So on page 2, Emily says, and I believe it's in summons to your e-mail, attaching the one document and not attaching the confidential notes, she says the attached e-mail is the responsive record I got from Steve for the records requesting on termination agreements with friends group, however since the attached document is labeled draft I'm wondering if it was actually used for the meeting on 8-5-21. Since we do not release draft documents as records, I want to confirm it was used for the meeting or if there is a final version available.

So at least it looks likes from this e-mail chain that what you attached -- what you

added to the folder was indeed the -- going back to the page numbers we were just referring to, -9531 and -2, because she's asking questions about it.
A Yes.
Q Okay. So the confidential notes must have been something else I guess is my point?
A No, it was the same thing. She had -- she had the document.
Q No. I guess --
A There was no other notes.
Q Okay. Well, it's -- then I'm confused because in your original e-mail on September 3, 2021 you say, Emily, I added an item to the folder, which obviously she got. The other was labeled as confidential notes so I didn't include that one. It sounds like you're saying you didn't include -3531 or -532, yet she's talking about -531 and -532 in the next e-mail as being included in the folder, so that's why I'm confused.
Do you -- do you -- were there any other confidential notes?
A I have no other notes.
Q So what were the confidential notes that you didn't include?

A The only thing I would have had would have been this.
Q Okay. Did you ever talk to Ms. Durrant about whether -- other than this e-mail chain, about whether to include -- I'm sorry. Strike that.
Did you ever talk to Ms. Durrant other than this e-mail chain about whether the department should produce -531 and -532, the agenda with the notes?
A I don't think I did. I think there was an e-mail there, but that -- I don't think I talked with her via telephone. Not that I recall.
Q Okay. Did -- did Missy to your knowledge upload any documents in response to this request?
A I'm guessing she did.
Q But you don't know?
A I didn't -- I didn't look to see which documents she included.
Q Okay. All right. Going back to Exhibit 58, I believe the one -- I'm sorry. Sorry.
Exhibit 59, this is an e-mail on August 4th at 10:32 a.m. between you and Ms. Vanlanduyt; is that correct?
A Yes.
MS. CARSON: Page 1 of Exhibit 59?

MR. POTTS: Correct, page 1.
BY MR. POTTS:
Q And Ms. Vanlanduyt is e-mailing you and she says, here is what I have. I asked Willi for the list of people, and we'll get to that in a minute; and then it says in the last paragraph, here are my notes. Let me know if you have edits. Otherwise I'll tweak slightly, but we can meet at Blue Mound at noon or meet over lunch somewhere. And then she has attached the notes that we've been discussing.
Do you know how -- or do you know why Missy prepared these notes?
A To help guide the discussion.
Q Did you all have conversations about what would be said at this meeting prior to the meeting?
A Yes, we probably did.
Q And I guess I'm trying to understand, did you have any involvement in what Missy put in these notes?
A We likely talked about it.
Q Okay. And that's kind of what I'm trying to understand. Did you and Missy sort of have a meeting to go through what you would talk about and these are her notes of, you know, your plan for the meeting?
A We -- we met briefly before the meeting.

Q But obviously -- you mean before the meeting, the day of the meeting?
A Yeah.
Q This was obviously before that, so she sent you this on 8-4-2021.
Did you direct her to put together an agenda for the meeting?
A I probably said -- I probably had said, you know, if -- if we have some talking points or some notes for the meeting, we likely probably -- I probably had her do that.
Q Okay. And did you -- before you saw this draft, had you already talked through these points with her?
A We may have talked about them. I can't say for certain that we went through all these points.
Q Okay. But base -- so it sounds to me like Missy is primarily responsible for putting together these notes and agenda?
A Yes.
Q All right. When you met prior to the August 5th meeting, did you go over these notes again?
A On that day?
Q Correct.
A Yes.

STEVEN SCHMELZER

Q And do these notes fairly summarize the -- what went on at the meeting?
A Yes. This was a guideline for them.
Q You mean for the meeting?
A For the meeting.
Q And these notes were never -- I mean, there was never a formal agenda given out at the meeting; is that correct?
A I believe so, yes.
Q Did you have a copy of these notes with you at the meeting?
A Yes.
Q And did you refer to the notes during the meeting?
A Yes.
Q When did you first learn of -- oh, I'm sorry. Let me go back to Exhibit 58. Then we can move on from this chain.
On -- in the e-mail from Missy on page -- at the bottom of page 1 of Exhibit 58, on Wednesday, September 8th in response to Ms. Durrant asking questions about the draft agenda in Exhibit 59 we were just discussing, Missy -- I'm sorry -- Emily asked Missy, since the document is labeled as a draft, I'm wondering if it was actually used for the meeting on 8-5-21. Since we do not release draft documents as records, I wanted to confirm it was used for the meeting or if there is a final version available; and then Ms. Vanlanduyt responded, we used it to review the notes ahead of the meeting but did not use it during the meeting and did not hand it out.

STEVEN SCHMELZER

I believe you just testified that at least you used the notes during the meeting; is that correct?
A I likely looked at them as I was talking with Willi and Greg.
Q Did you respond or -- to Ms. Vanlanduyt's e-mail or Ms. Durrant's e-mail in any way about this document?
MS. CARSON: When you say this document, you mean Exhibit 58 or the document that --
MR. POTTS: Yeah.
MS. CARSON: -- that Emily is referring to?
MR. POTTS: That's a good point.
BY MR. POTTS:
Q I guess Emily asked, you know, how did you use this document, and Missy responded, and I'm wondering if you ever responded to Ms. Durrant about how you used the document during the meeting?

STEVEN SCHMELZER

A I don't -- I don't think I did. Don't see anything here.
Q Okay. And you don't remember any other e-mail chains about this?
A No.
Q When did you first learn -- and we can be finished with that one.
A Okay.
Q When did you first learn that the Friends of Blue Mound State Park filed a petition for judicial review challenging the master plan for the Blue Mound State Park?
A I believe it would have been in June.
Q In June of '21?
A Yes.
Q And other than your attorneys, did you discuss the petition for judicial review with anyone else back when it was first filed?
A Likely Kevin Swenson.
Q And Kevin is the head of Blue Mound State Park?
A Yes.
Q Anyone else?
A Not that I'm aware of.

STEVEN SCHMELZER

Q Did you ever discuss the Blue Mound petition with Timm Speerschneider?
A No.
Q Did you ever discuss it with anyone from a snowmobile group?
A No, not that I'm aware of.
Q Okay. On I believe Exhibit 47.
A Uh-huh.
Q Yes. These are the defendants' responses to plaintiff's interrogatories, and I have some questions about a couple of the responses here.
It looks like -- and again, this is in response to request number one, which states, have any communications regarding the termination of the friends group grant between the DNR and Blue Mound State Park occurred between you and anyone else and/or between you and your employees; and there's a list of dates here where there were potential -- or where there were discussions that are responsive to this request, and I want to go -- ask a couple questions about a few of them.
On August 5, 2021 it says Missy and you met, and then in parentheses, stood outside the shelter for approximately 10 minutes prior to

meeting with Mr. Van Haren and Friends of Blue Mound State Park vice president Greg Wiegand to discuss speaking points and how to approach the meeting. They agreed to discuss the friends group agreement, share their support for all friends groups, share their appreciation of the friends group, and relay that they would like the partnership to continue into the future.

Did you have any role in drafting that response?

A When you say role, I guess I'm not understanding when you say -- I mean, obviously we provided the comment that we had met that day, so --

Q I mean, I guess did you review this specific response language?

A Oh, yes. Yes.

Q And sign off on it?

A Yes.

Q And it says at the end of that response, as part of the meeting you wanted to relay that they would like the partnership to continue into the future.

What did you mean by that?

A The friends of Blue Mound was a -- you know, is a good friends group. They've done a lot of great

things for the -- for the property, so we'd like to continue to have them as a friends group and continue the relationship with them.

Q Did you during the August 5th meeting tell the friends group that they would have to drop their lawsuit or the department would be initiating termination of the existing friends group agreement?

A We -- we talked about that it was -- it was contrary to the agreement, the friends group friends' agreement that they signed, or signed off on.

Q And I guess could you just answer the exact question I asked?

MR. POTTS: And read it back, please.

(RECORD READ.)

THE WITNESS: We talked about that, yes.

BY MR. POTTS:

Q And you say that the -- it was the department's position that the friends group was violating the friends group amendment because it had brought the lawsuit; is that correct?

A Yes.

Q Have you reviewed the Blue Mound's friends group agreement?

A Yes.

Q Did you review it prior to the meeting on August 5th?

A Probably I think I did, but I can't say for certain.

Q And who at the department determines whether or not a friends group has violated a friends group agreement?

A Staff, both -- probably the property -- property staffing and then maybe the -- because Missy's section works on it, probably Missy and probably go through legal then also.

Q And did you go through all those steps prior to this August 5th meeting?

A I don't know if specifically if we talked to legal at that point.

Q And if you did, I think you can tell me you talked to them but not what you talked about.

A I'm guessing we -- we may have.

Q And in what ways -- well, let me ask you this:

Was it you who determined that the friends group lawsuit violated the agreement?

A No, I don't -- I don't believe it was me that -- it may have been brought up, you know, in a discussion, but I didn't specifically take a look at the agreement and then take a look at the lawsuit and determine that.

Q Okay. And so you were relying on someone else's

determination that this was a violation of the friends group agreement?

A Yes.

Q And would that have been, again without telling me it was -- do you know if it was Missy who made that determination?

A I -- I don't know exactly who would have -- who would have done it. I'm guessing probably legal and Missy.

Q Okay. And did you ever provide the Blue Mound's friends group with any detailed explanation of why you thought the lawsuit violated the friends group agreement?

A I think we in general talked about the -- in discussion talked with Willi and Greg about the friends group were there to support the property.

Q But did you ever, like, point to any specific provisions in the agreement that you thought they were violating?

A No. We didn't -- I didn't, like, have the agreement and say, oh, you're in violation of this particular subset of that, no.

Q And did you ever -- I guess going back to the meeting notes we've been discussing and agenda in Exhibit 59, do you have that? That should be this one.

STEVEN SCHMELZER

A Yeah.
Q On the first -- well, the first bullet point is intro, thank you for coming; and then the second bullet point, which is the sub bullet, says overall agenda.
Do you see where I am?
A Yes.
Q And it says review of existing agreement, and we talked about bullets one and two, but it says spending friends group funds on legal fees cannot do per agreement.
Did you discuss that during the meeting?
A We likely did.
Q Did you ever ask the friends group if they were spending any friends group funds on legal fees?
A I don't think so. I think we maybe just talked about it, but I don't think we said, hey, are you using friends money. I don't think we knew.
Q But you assumed they were?
A We didn't know.
Q But you didn't ask them?
A I think we just were making the point that it was -- that in the agreement that you can -- that there was specifically what you can spend those monies on.

STEVEN SCHMELZER

Q Okay. And was that one of the reasons you thought the lawsuit was violating the agreement?
A No. I think it was just a matter of the support, you know, that a lawsuit I wouldn't consider to be supporting the park.
Q Why not?
A I guess I wouldn't consider getting sued as being support.
Q Do you -- do you agree there's a difference between the park itself and the DNR?
A No.
Q So why not?
A It's all part of the DNR.
Q So it's your view that the park and the DNR are the same thing?
A Are you talking specific to the property, you know, like, oh, the lands that -- the Blue Mound or I guess I'm not understanding.
Q I guess -- well, I'm trying to understand what your view is. The -- the Blue Mound State Park is property, correct?
A Right.
Q And the DNR owns that property, correct?
A State of Wisconsin, that's correct.

STEVEN SCHMELZER

Q The State of Wisconsin, right. And so is -- it's your position that the park and the DNR -- well, let me back up.
The friends group didn't sue the property, did they?
A They sued the department.
Q And what did they sue the department over?
A The master plan.
Q In particular, what did they sue about?
A The snowmobile trail.
Q Okay. And so it's the department's view that a lawsuit against the department's choices of uses at the park can never be in support of the property at the park?
MS. CARSON: Objection. Vague. Compound.
MR. POTTS: Okay. All right. Let me ask a different way.
BY MR. POTTS:
Q If the Department of Natural Resources determined that it wanted to put a gun range at Blue Mound State Park and the friends group sued the department and said the gun range would be bad for the park, is that -- would that be a different situation than the situation here?

STEVEN SCHMELZER

MS. CARSON: Objection. Incomplete hypothetical.
MR. POTTS: In your view.
MS. CARSON: Go ahead and answer, if you can.
THE WITNESS: If the master plan had indicated, you know, through the planning process that that was a viable option, then -- I mean, as a master plan process, you know, worked out, you know, that's what the master plan process is for. And if the friends group that was involved with the master plan process, correct? I'm guessing. So they would have -- they would have had an opportunity to provide input during that time. So if -- if -- I know there's not one in there, a gun range on there, and it had been approved and then the friends group decided at that point that, hey, we're not -- we're not supporting that, that would -- and they wanted to file a lawsuit relative to that, it would be the same circumstance with the snowmobile trail.
BY MR. POTTS:
Q So is it possible that the friends group thinks that it would be better for the park, the property, to not have the snowmobile trail?

A Tell me that again.
Q All right. I'll ask in a different way.
Is it possible for -- that not having the snowmobile trail at Blue Mound State Park would be better for the ecological viability of the park?
A It's possible, I suppose.
Q Okay. And so it's the department's position that if the department, whatever the department decides is good for the property, the friends group has to agree with?
A I guess that would -- I mean, there's disagreements on friends groups of -- of whether they think it -- you know, that might be the best idea, so they could -- they could certainly disagree, but that's different than filing a lawsuit I would say.
Q Why is that different?
A The -- because the plan -- I mean, the planning process that -- you know, if it includes a planning process, that goes through, you know, public input and all those different processes to get that information. And I'm guessing the friends provided information during that time and it was determined that -- that the snowmobile trail would go in. I mean, that would -- that it would be moved.

Q Okay.
A I mean, there's also a snowmobile trail there.
Q Well, let me ask you this:
Are you aware that the friends group's lawsuit is challenging the planning process itself?
A Yes.
Q Okay. And so if the department did not follow the procedures it's required to follow in the planning process, would you say that that would be good for the property?
A So you're asking -- say that again.
MR. POTTS: Can you read back the question?
(RECORD READ.)
THE WITNESS: Probably not.
BY MR. POTTS:
Q Has the department to date provided notice to the Friends of Blue Mound State Park that they intend to terminate the agreement?
A No.
Q Why not?
A We have no intention of terminating it.
Q But back on August 5th you've already testified that you told the Friends of Blue Mound State Park that

their agreement would be terminated if they didn't drop the lawsuit, correct?
MS. CARSON: Objection. Misstates prior testimony.
Go ahead and answer.
THE WITNESS: It could be, but it was never terminated. That was an option.
BY MR. POTTS:
Q Why wasn't it terminated?
A I think that we -- the preference would be that we would work through -- work through the agreement with the friends. As we talked about, they're -- they're a valuable resource for the park and for the department. They have a lot -- they have a lot to offer the park and the department and the visitors. Our preference has always been to work -- work with them, to continue with that relationship.
Q I understand, but -- I understand that, but that implies the continuing relationship, at least based on this agenda, would -- would require them to drop the lawsuit, correct?
MS. CARSON: Objection.
THE WITNESS: No.
MS. CARSON: Argumentative.

Go ahead and answer.
THE WITNESS: Not necessarily. They could continue the lawsuit as a -- as a non-recognized group for a friends group.
BY MR. POTTS:
Q I understand, but I guess, again, turning back to Exhibit 59, the -- where we were under the bullet review of existing agreement, do you see that?
A Yes.
Q And the second bullet is only way to cure is to drop the suit. The suit has not been dropped, correct?
A That's correct.
Q And the department has not terminated the agreement, correct?
A That's correct.
Q Did -- what changed between then and now?
A When -- when we talked with Willi and Greg, we didn't -- we didn't say, hey, we're terminating this today and that's it. We just said, hey, we thought it was in violation of the agreement, and the possibility exists it could be terminated. We never said we're terminating this agreement.
Q So if Willi and Greg were to testify that at the end of the friends group meeting they specifically asked

you, are you -- and, quotes, you are saying if we don't drop the lawsuit you are going to terminate the agreement, and you said yes, that they are lying about that?

MS. CARSON: Objection. Argumentative.

Go ahead and answer.

THE WITNESS: At the end of the meeting when we talked with them, we had said they were going -- they were going to go back and talk to their -- to the friends, to the board, to talk about what their -- what their options would be; and then they could -- they could let us know what -- you know, what they were. And I think they also asked about the master plan, you know, some more discussion on the master plan, but, you know, if -- and that's I think where we left it. We didn't say that, oh, we're going to -- you know, we're going to terminate the agreement. I mean, I think we -- we could have just sent a letter saying, hey, we're terminating this agreement, but we didn't do that.

MR. POTTS: Can you read back the question I asked again because I asked a very specific question and I'd like you to answer that one, please.

(RECORD READ.)

MS. CARSON: Same objection.

THE WITNESS: Again, we said that the -- we wanted to continue to work with them, and we went as far as the agreement is concerned that that -- that that might happen. And if -- and if they came back and said, no, we're not dropping the lawsuit, could that potentially be an action that happened, yes.

BY MR. POTTS:

Q Well, did -- did the --

A But our intention was not at the time to say, hey, drop it now or we're going to terminate it tomorrow. That wasn't the -- we wanted to talk with them about it before -- before we did anything else.

Q Did you give them a deadline to drop the lawsuit?

A I think we had talked about can you -- they were going to let us know within a week or so, and then I believe that they said, oh, they have a meeting coming up on the 16th or something like that and we're like, yeah, that's fine, you can let us know what the --

Q So again, they would be letting you know whether they would drop the lawsuit, correct?

A I think, yeah, they were going to know -- they were going to talk with the board and determine their next steps.

Q And the next step we're talking about on August 16th would be whether to drop the lawsuit, correct?

A I don't think it was being like, hey, let us know by this date if you're going to drop the lawsuit and then we're going to terminate the agreement. There was never, like that I recall, a frank discussion. I think it was going to be, hey, they were going to let us know they were going to take it back to the board and talk about what we were going to talk about.

Q It was a fair assumption on the -- Willi and Greg's part that if they did not drop the lawsuit by you said August 16th that the department was going to terminate the friends group agreement?

A I guess you would have to ask them that, I mean, how they felt. They may have felt that -- that, yeah, if -- if the lawsuit wasn't dropped that the agreement could potentially be terminated, and we talked about that. But did we say, hey, if you don't drop it by this date, it's going to be terminated, no matter what? I don't think it was that. I mean, it was a very low key -- I mean, there was no problems

in the meeting.

Q And I guess my question isn't what they felt, it's whether you think it was a reasonable interpretation on their part that if they didn't drop the lawsuit the department was going to terminate the friends group agreement?

MS. CARSON: Objection. Asked and answered.

MR. POTTS: You can still answer.

THE WITNESS: A reasonable interpretation of what they thought? I guess you would have to ask them.

BY MR. POTTS:

Q I'm asking you whether -- you were in this meeting, right?

A Yes.

Q And there were four of you, correct?

A Yes.

Q And you went through an agenda that we have, and it says in bullet two, only way to cure is to drop the suit, correct?

A Yes.

Q And I'm asking you whether it was a reasonable interpretation for the other two people you were

STEVEN SCHMELZER

communicating to to walk away from that meeting thinking if they don't drop the lawsuit the department is going to terminate the agreement?
A To some extent. But we also -- the meeting started with we want to continue this partnership, we want to continue to work together.
Q Right. But part of that was assuming they dropped the lawsuit, correct?
A That -- the lawsuit obviously was the -- what we talked about that was in violation of the agreement.
Q Okay. Let me talk to you about the events leading up to this meeting.
Were you in communications with the friends group prior to the August 5th meeting?
A Me personally?
Q Correct.
A No, I don't believe I was.
Q That was Missy that set up the meeting?
A Yes.
Q And did -- were you ever on any of the phone calls or conversations between Missy and I think it was Willi to set up the meeting?
A No.
Q Were you ever told that the friends group members did

STEVEN SCHMELZER

not want to discuss the litigation at the meeting?
A I don't recall.
Q Back on Exhibit 47, which are the responses to the interrogatories, there's no page numbers so I'm going to go on page 5, which is under the heading -- or just above the short August 5, 2021 heading -- and it actually starts on page 4. It's a description of the meeting that occurred on August 5, 2021. It says that the friends -- and again, I'm on page 5 -- they thanked Missy and Steve multiple times for meeting with them rather than sending a letter with no explanation as they put it.
What letter were they referring to?
A The -- if we were going to terminate the agreement, I believe it has to be in writing.
Q So Willi and Greg were thanking you and Missy for not already having sent the letter; is that correct?
A Yes.
Q Did you or Missy ever tell Willi and Greg that you could have just sent the letter?
A Yeah, I think we -- we had said that, you know, the -- it could have -- it could have been done that way.
Q And who would decide to send the letter terminating a

STEVEN SCHMELZER

friends group agreement?
A It would be myself, probably legal, and other department staff.
Q But you could decide in your role as the state parks director to terminate a friends group agreement if they were violating it?
A Yes.
Q It says on August 5th you had another conversation with Ms. Vanlanduyt following the meeting. What was discussed at that follow-up meeting?
A I think just how we thought it went.
Q And -- sorry. Go ahead.
A I never met Willi and Greg. They seemed to be very nice, easy to work with.
Q And after the meeting, was it your impression that the friends group was likely to drop the lawsuit?
A It's hard for me to say if it was likely they were going to -- if they were going to do it.
Q I just wondered what you thought at the time.
A It was a possibility I would think.
Q Did you think -- I mean, when you and Missy talked after the meeting, did you all talk about whether you thought they were going to drop the lawsuit?
A I think in general we just said it seemed like it --

STEVEN SCHMELZER

like it went all right. I mean, that we, you know, gave them the information and that was probably possible.
Q Did you ever talk to Ms. Brusoe about this meeting prior to it occurring?
A I'm sure I probably did.
Q Did you ever talk to Ms. Brusoe prior to the August 5th meeting about the fact that you thought they were -- the friends group was violating the agreement?
A Probably.
Q Did you ever -- I guess I'm trying to understand what Ms. Brusoe's role was prior to this meeting. Can you just generally describe?
She was your boss, right, at the time?
A Yes.
Q And did you meet with her prior to this meeting to talk about what -- did you and/or Missy meet with her to talk about what you plan to -- actions you plan to take at the meeting?
MS. CARSON: Just -- I want to caution you that if you want to talk about meetings that involved attorneys, you don't provide that information, but other meetings you can testify

about.

THE WITNESS: I don't recall any specific meetings where it was Diane and Missy and I and we talked specifically about this meeting. We -- and, I mean, I had been on the job, what, two weeks? And so I would probably meet with Diane on -- multiple times a week, you know. So was it ever a specific meeting that laid out, okay, this is -- we're going to talk about Blue Mound, no. There was a list of topics I'm sure that we may have -- we may have talked about, and Diane may have been in transition at, like, the section meeting, you know, maybe the previous -- I had maybe two of those, so maybe she was there and -- but it was -- I don't recall any specific meetings with the three of us and talked about, oh, this is what all we talked about.

BY MR. POTTS:

Q And I guess I don't need to be that specific. What I'm trying to understand is did -- would Ms. Brusoe have known what you and Missy were going to talk to the friends group about at the August 5th meeting before you did it?

A Oh, I'm guessing she would have. I mean, I was two weeks on the job, so I'm --

Q You wouldn't have gone to that meeting without talking to her about it?

A I'm guessing I would have -- yeah, I would have -- we would have talked about it.

Q Okay.

A But, you know, did she look at the -- you know, the note, you know, Missy's notes? I -- I'd have to ask her that. I don't recall exactly, but --

Q And would -- would she have generally been aware that the department was at least considering terminating the friends group if the Blue -- terminating the friends group agreement if Blue Mound friends group didn't drop the lawsuit?

A Say that again.

MR. POTTS: You want to -- and I have -- just so you know, I have her read it back just so we don't have the same thing over and over in the transcript.

(RECORD READ.)

THE WITNESS: I would say she obviously knew that was a possibility.

BY MR. POTTS:

Q I mean, did she --

A We never -- I'm sorry.

Q Did she -- did she know that you were going to be talking about that at this meeting?

A Yes, I would say she probably did.

Q Okay.

A We probably talked about it.

Q On -- back to Exhibit 47, I'm on the August 6th date now, it says there was an FWP, which I am assuming is fish and wildlife, division leadership team meeting and then afterwards you met for 30 minutes with Missy to discuss the meeting.

Do you remember what you discussed in that August 6th meeting?

A Seeing it was with the fish and wildlife parks division, probably just let them know that we had a meeting with -- with the friends.

Q Yeah. Thanks. I wanted to clarify. I meant -- it says you met afterwards with just Missy for 30 minutes to discuss the meeting.

A I think that's referring to the meeting that we had after the -- the August 5th meeting and just talked about how we thought the meeting went. She's -- she's not on fish and wildlife and parks division leadership team meeting.

Q All right. And then on August 11th there's another

meeting between you, Ms. Brusoe, Mr. Hefty, and Ms. Vanlanduyt; and at that meeting, what occurred?

A We probably discussed the -- how the meeting -- how we thought the meeting went.

Q And on August 11th, was it this -- it was your position and Ms. Brusoe and Mr. Hefty and Ms. Vanlanduyt, the four of you in this meeting, was it still your position that the DNR was likely to terminate the friends group agreement --

A No. I'm sorry.

Q Likely to terminate the friends group agreement if they did not drop the lawsuit?

A No.

Q Why not?

A We hadn't determined that the agreement was going to be terminated. We talked about that that was a possibility, but it was never by this date it's going to be terminated or that -- there was never discussion of that.

Q All right. And then on October 13, 2021 there's a meeting between Deputy Secretary Todd Ames, Division Administrator Keith Warnke, Diane Brusoe, you, and Ms. Vanlanduyt and two DNR attorneys; and I have to be careful here because I don't want you to talk

about what you talked about with the attorneys, but it does state specifically in this response that at this meeting Todd Ames emphatically affirmed and reiterated the department's position that it would not exercise termination rights under the friends group agreement and that the department would not treat the friends group's legal action as a violation of the friends agreement.

Do you see that?

A Yes.

Q Was that -- was this meeting the first time Mr. Ames had been talked to about this issue?

A I don't know.

Q Was this the first time you and Missy had talked to Mr. Ames about this issue?

A I never talked with him about it.

Q Not prior to this meeting?

A No.

Q And Mr. Ames is your boss; is that correct?

A Diane is my boss.

Q Oh, but he's Diane's boss?

A Yes, he would have been at that time.

Q So he's up the chain from you?

A Yes.

Q But you're not aware of Mr. Ames being consulted prior to this meeting about this issue?

A I have no knowledge if or when that occurred.

Q Can I turn you to Exhibit 23, please.

THE WITNESS: Okay. Do you mind if I just take a quick break?

MR. POTTS: Yeah, sure. We can take a break. Sorry.

(Break taken from 11:06 a.m. to 11:27 a.m.)

BY MR. POTTS:

Q Okay. I was turning your attention to Exhibit 23, and at the top of that exhibit is an e-mail from you to Missy on July 12th that's talking about the Blue Mound petition, or at least the subject is Blue Mound petition for judicial review.

Do you see that e-mail?

A Yes.

Q Okay. And the -- it says Missy, quote, Kevin is working on a document that lays out the scope of the friends help to the park. He will get that to us early in the week. Why was Kevin preparing a document that lays out the scope of the friends help to the park?

A I think so everybody would be aware of it.

Q And then the next sentence says, he thinks that Bill would be open to meeting with us. Who's Bill?

A Willi.

Q Oh, okay. And then it says, once the information -- once we have the information, you can craft an action plan we can seek approval for.

What did you mean by craft an action plan?

A I think to -- like, a policy brief or a briefing on what could possibly happen.

Q Okay. And actually I'm going to ask you some questions about -- so were you talking about the -- the policy brief that was later --

A Yes.

Q -- put together here?

Okay. And -- and who would you need to seek approval from?

A From -- well, typically in a situation like a policy brief like that, it would go to my supervisor and potentially legal.

Q And at this point were you the Director of State Parks yet?

A That would have been my first day.

Q Okay. So your director would have been Diane Brusoe?

A Yes.

Q I see. Okay. You hadn't even changed your e-mail?

A No, I hadn't.

Q Okay. All right. I'd like to turn your attention to Exhibit 24, and in particular you're not on any of these e-mails I don't believe, but I wanted to ask you about something that Missy said in this e-mail on the first page on Monday, May 24, 2021. And Missy's e-mailing Ms. Brusoe, who we've established is now your boss, and she says here's some points about friends groups; and then the first bullet, we have agreements with friends groups. Those agreements outline our ability to dissolve the agreement for multiple reasons, including friends groups speaking out publicly against the department.

Is that the department's position that friends groups are not allowed to speak out publicly against the department?

A I am just reading this over. I think they could -- I think they could voice -- voice that for sure if there was something they might be opposed to.

Q And I guess turning to the last bullet point on that same e-mail, it says in the event that a friends group does speak out publicly against the department, it is the program's responsibility to determine the

STEVEN SCHMELZER

risks and opportunities associated with the friends group when determining if dissolution of the agreement is warranted.

Is that still the department's position today?

A Yeah, I think that's -- that would be accurate.

MR. POTTS: Okay. I'd like to turn you back to Exhibit 8. I believe when we were talking about Exhibit 23, you mentioned a policy brief, and I -- I think we have that policy brief, or at least the version of it in Exhibit 8. And I'm looking at page -9538 through -42. Maybe not. Hold on a second.

THE WITNESS: -9524?

MR. POTTS: -9540.

MS. CARSON: You're looking for the one with the comment on it?

MR. POTTS: I guess it doesn't matter which one. Which one doesn't have the comments is fine with me.

MS. CARSON: I'm looking at -9524.

MR. POTTS: We'll work off that one for now.

BY MR. POTTS:

STEVEN SCHMELZER

Q All right. So -9524 and -9525 and then sort of blank page -9526, is that the policy brief that you were referring to earlier when we were discussing the action plan?

A Yes.

Q Okay. And when does the DNR generally create these policy briefs?

A I guess for policies or issues or things that come up, I guess. I don't know specifically when you -- when you do it or you don't do it, but --

Q Okay. So there's not like a specific protocol for when to do it or not to do it that you're aware of?

A Yeah. I mean, most -- if it's, you know, more decision-based items, especially maybe if it goes above us potentially, then that would be one. When I say us, I mean, like, the program.

Q And to your knowledge was Ms. Brusoe involved in reviewing this policy brief?

A I -- I believe she's -- she saw it, but I -- I don't know for sure. Actually, I probably sent it to her so she was aware of it, yes.

Q And then on page -9525 it says there's three options laid out here, terminate the agreement with option one, terminate the agreement with a friends group

STEVEN SCHMELZER

with opportunity to cure, and then there's some risks and opportunities listed; option two is do nothing; and option three is modify our partnership activities with the friends group during this time. And then under all of them it has risks and opportunities.

Did I read that correctly?

A Yep.

Q And then the first sentence below that says, is the recommendation of the program to discuss the possibility of the department modifying our activities or terminating our agreement with the friends group president directly prior to making a final decision on how to move forward.

Do you see that?

A Is it that last paragraph here?

Q It's the -- that's the last paragraph. Yeah, sorry. The paragraph that starts under number three.

A Okay.

Q And then I want to point to the last -- well, the sentence I just read basically says it's the department's position that you should talk to the friends group president directly; is that correct?

A Yes.

Q And then the last sentence of that paragraph said,

STEVEN SCHMELZER

the department will share that it is a strong possibility that the friends group will receive a letter of termination with the opportunity to cure, but the only way to cure would be to drop the litigation.

Did I read that correctly?

A Yeah.

Q And is that in line with what happened at the August 5th meeting?

A Yeah. I mean, we -- we said that this language sounds a little stronger to me, strong possibility that friends group will receive a letter of termination. We never said on this date you're going to get a letter of termination. We said that there's a possibility that that could happen, but we never --

Q You didn't say it was a strong possibility?

A No, I don't think we said it that way.

Q All right. Exhibit 25 you should have in front of you, and this is an e-mail from Ms. Brusoe to you on -- I'm sorry. If you look at the second e-mail in this chain, it's from you to Ms. Brusoe and it says, Diane, here's the draft of the Blue Mound issue brief. I made a few minor changes. Would like to talk to you about this before it is moved on.

And when you say issue brief, is that the same as the policy brief?
A Yes, yes.
Q Okay. And that's the one we were just discussing?
A Uh-huh.
Q You got to say yes.
A Yes. I'm sorry.
Q All right. And then Dianne says, yes, let's discuss when Missy gets back. I really see one -- I really only see one option here.
Do you see that?
A Yes.
Q What option was Ms. Brusoe talking about?
A I'm thinking it was to meet with the friends.
Q Is that -- I mean, there's three options in that issue brief, terminate the agreement with the friends group with opportunity to cure, do nothing, or modify our partnership activities with the friends group during this time.
Is -- was she talking about one of those three options in your opinion?
A I'm guessing that we would go meet with the friends. I -- I don't recall. I mean, I guess we'd have to ask her what -- what she sees as the only option

there.
Q I mean, was it your understanding that Ms. Brusoe supported at least the possibility of terminating the friends group agreement if they didn't drop the lawsuit?
A I think there was a possibility of that.
Q And Ms. Brusoe was aware of that possibility at the time?
A I'm guessing she was. I --
Q I mean, she -- she clearly got this issue brief.
A She saw the issue brief.
MR. POTTS: Sorry. One at a time.
BY MR. POTTS:
Q She definitely saw the issue brief?
A Right. So she knew -- I would guess she knew that was a possibility.
Q And did you discuss it with her?
A Probably, yes.
MR. POTTS: Can I see Exhibit B?
(Exhibit 60 marked for identification.)
BY MR. POTTS:
Q Mr. Schmelzer, this is an e-mail between Missy and Willi Van Haren, and in this she says, Hi, Willi. I hope you're well and enjoying your summer. Steve

Schmelzer, former southwest park district supervisor is now our program bureau director replacing Ben Bergey. Steve and I would like to meet in person with you next week to hopefully discuss the Blue Mound master plan, our agreement, and answer questions you may have. Our intent is to hopefully meet at the park. And then she goes on to talk about the specific scheduling issues.
Were you aware that Missy was sending this e-mail to Willi?
A Uh-huh. I knew she was going to contact him.
Q You got to say yes, sir.
A Yes. Sorry, I still had water.
Q And is there anywhere in this e-mail that says that the discussion -- or that a topic of the meeting will be the litigation?
A No.
Q Would you agree that the --
A I mean, it says the Blue Mound master plan, our agreement, and answer questions you may have.
Q It doesn't say anything about the litigation; is that correct?
A No.
MS. CARSON: It is correct that it doesn't

say anything about the litigation?
THE WITNESS: Yes, it doesn't say litigation in there.
MR. POTTS: Okay.
THE WITNESS: Sorry.
MS. CARSON: That's okay. I just don't want to read the transcript later and be confused.
MR. POTTS: Exhibit C. Can I turn you back to Exhibit 59.
(Discussion held off the record.)
BY MR. POTTS:
Q In this e-mail between Missy and you, again the day before the meeting, which we've discussed, it says, I asked Willi for a list of people. It included Karl. I requested we meet without Karl or figure out a different date at which we could meet without Karl so we'll see.
Who is Karl?
A Karl Heil.
Q And why did Missy not want Karl in the meeting, if you know?
A I would say Karl can be maybe a little overzealous on items.
Q Okay. And was that -- was it Missy's idea to not

have Karl be at the meeting, or was that your idea?
A I think we probably all talked about that.
Q And the reason you didn't want Karl in the meeting was because he could be overzealous; is that fair?
A Yeah. Yes.
Q In your experience is it common with meeting with friends groups to ask them not to bring people to a meeting?
A I don't know if that's common or not.
Q Have you ever seen it before?
A Not that I'm aware of.
MR. POTTS: I'm going to mark this as Exhibit 61.
(Exhibit 61 marked for identification.)
BY MR. POTTS:
Q And Exhibit 61 was produced to us in discovery, I believe, and is a text chain between you and Ms. Brusoe; is that correct?
A Yeah, I think so.
Q And it says on August 19th, I see you wanted to talk about BMSP. Is BMSP the Blue Mound State Park?
A Yes.
Q And then you say, can I call you later on this?
What did you talk about -- or did you have

that call?
A I don't know if I did or not.
Q Can't remember?
A No, I --
Q Okay. So then you also probably don't remember what you would have said on the call?
A No.
Q We talked about Mr. Swenson a little bit. He's the -- well, what's his title?
A He's the property manager.
Q At Blue Mound State Park?
A Yeah, park manager, property manager.
Q And Mr. Swenson probably interfaces quite a bit with the Blue Mound friends group; is that right?
A Yes.
Q And were you concerned about Mr. Swenson's ability to do his job because of the pending lawsuit with the friends group?
A No.
Q Are you aware of any other friends groups facing potential termination of their agreement at this time?
A No.
Q Back prior to the -- or around the time of the

August 5th meeting, were you personally in support of terminating the friends group agreement if they didn't drop the lawsuit?
A Personally or -- or as a department representative? I guess I --
Q Either.
A My presence would have been to not terminate it, to work with -- to work with, you know, the friends on this.
Q But if they -- if they didn't drop the lawsuit and you had to make a decision, would your decision have been to terminate the friends group agreement?
A Hard to say. I don't -- while I can certainly make that decision, I would have -- you know, I would have talked with -- you know, if it got to that point, would have talked with a number of other department staff to determine if that was in the best interest of the department.
Q And would the -- if you did terminate the friends group agreement, what would happen to the money that the friends group had in its bank accounts, do you know?
A It goes back to the state.
MR. POTTS: All right. Let's just take a

quick break. I want to see if I have any other questions and be done soon.
MS. CARSON: Okay.
(Break taken from 11:53 a.m. to 11:54 a.m.)
MR. POTTS: I just have one last question.
BY MR. POTTS:
Q What -- was the goal of the August 5th meeting to get the friends group to drop the lawsuit?
A I think the goal was to make them aware that we -- the department thought it was in violation of the agreement, to have them understand that part of it, that by -- you know, the lawsuit was in violation -- or our opinion was it was in violation of the agreement, so the possibility exists that it could be terminated.
MR. POTTS: Okay.
THE WITNESS: Does that answer your question?
MR. POTTS: Yeah. I don't have anything further.
MS. CARSON: No.
MR. POTTS: I would like to put on the record, though, the possibility of continuing the deposition. We are -- I'm -- we've had a few

STEVEN SCHMELZER

back-and-forth e-mails about whether documents have been fully produced; and if there are additional documents that I haven't had today that come out, I'd like to leave the possibility of recalling him, but we're done for today.

MS. CARSON: Okay.

(Original exhibits attached to the original transcript; copies provided to attorneys ordering exhibit copies.)

(The deposition concluded at 11:56 a.m.)

* * *

STEVEN SCHMELZER

STATE OF WISCONSIN )

MILWAUKEE COUNTY )

I, JENNIFER M. STEIDTMANN, Registered Professional Reporter, Certified Realtime Reporter, Certified Realtime Captioner, and Notary Public in and for the State of Wisconsin, do hereby certify that the preceding deposition of STEVEN SCHMELZER was recorded by me and reduced to writing under my personal direction at Perkins Coie, LLP, 33 East Main Street, Suite 201, Madison, Wisconsin, on the 1st day of June, 2022, commencing at 8:56 a.m. and concluding at 11:56 a.m.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

In witness whereof I have hereunto set my hand and affixed my seal of office on this 13th day of June, 2022.

Jennifer steidtmann

JENNIFER M. STEIDTMANN, RPR, CRR, CRC

Notary Public in and for the State of Wisconsin

My Commission expires 11/2/2022

ERRATA SHEET

Case Name:

Deposition Date:

Deponent:

| Pg. | No. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |
| ___ | ___ | __________ | __________ | ____________________ |

_____________________

Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS ____ DAY OF __________, 2022.

____________________

(Notary Public) MY COMMISSION EXPIRES:__________

**-**

**-2** 50:4
**-3531** 50:17
**-42** 86:13
**-531** 50:18 51:8
**-532** 50:17,18 51:8
**-9524** 86:15,22 87:2
**-9525** 87:2,23
**-9526** 87:3
**-9531** 48:5,8,9 50:3
**-9532** 48:5
**-9536** 48:7
**-9538** 86:13
**-9540** 86:16

**0**

**009531** 48:2

**1**

**1** 43:14 51:25 52:2 54:20
**10** 5:16 22:5,7 32:25 57:25
**10-12** 5:15
**101** 4:19
**10:32** 51:22
**10:33** 38:2
**11:06** 83:10
**11:27** 83:10
**11:53** 97:5
**11:54** 97:5
**11:56** 98:11
**11th** 80:25 81:6
**12** 5:14,16
**12th** 14:8 83:14
**13** 81:21
**16th** 71:21 72:5,16
**19** 38:2
**1992** 11:15
**19th** 38:12 94:21
**1st** 44:4

**2**

**2** 48:25 49:13
**20** 9:24
**200** 14:15,22
**2000** 11:17
**2008** 11:19
**2010** 44:2
**2010-2011** 12:8
**2018** 11:4,9 13:9,10
**2019** 11:20,21 12:24 13:2 20:5,17
**2021** 12:24 14:4,7 20:5 38:2 40:18 43:14 50:13 57:23 75:7,9 81:21 85:8
**2022** 21:13
**20th** 38:22
**21** 56:16
**23** 83:5,12 86:10
**24** 9:19 85:5,8
**25** 9:20,22 11:11 89:19

**3**

**3** 50:13
**30** 9:24 31:14 80:10,18
**3:56** 44:4
**3rd** 44:20

**4**

**4** 37:10,18 43:14 75:8
**400-hour** 9:17
**47** 57:8 75:4 80:7
**4th** 51:21

**5**

**5** 57:23 75:6,7,9,10
**500** 14:18
**58** 43:6,7 49:2 51:19 54:17,20 55:17
**59** 45:24 46:3,11,14 51:21,25 54:22 61:24 69:8 93:10
**5th** 36:20 45:19 53:21 59:5 60:2,11 67:24 74:15 76:9 77:9 78:22 80:21 89:10 96:2 97:8

**6**

**60** 91:21
**61** 94:14,15,17
**6th** 80:7,13

**7**

**7** 46:19

**8**

**8** 46:20,23 47:16,19 86:9,12
**8-4-2021** 53:6
**8-5-21** 49:20 55:2
**8th** 54:21

**9**

**92** 29:13,14,18
**93** 11:15
**99** 11:17
**9:45** 37:16
**9:49** 37:16

**A**

**a.m.** 37:16 51:22 83:10 97:5 98:11
**ability** 4:21 85:13 95:17
**absence** 18:14
**accounts** 96:22
**accurate** 86:7
**acting** 15:24 16:16 18:13 20:11,15
**action** 24:8 71:9 82:8 84:6,8 87:5
**actions** 24:13,14,18 77:20
**activities** 33:19 88:4,12 90:19
**actual** 18:6
**add** 38:20 46:25 47:5
**added** 44:20 46:24 47:4 48:20 50:2,14
**addition** 28:25
**additional** 16:3 40:9 98:3
**address** 4:18
**administered** 22:13
**administrator** 17:25 18:6,10,14,19 19:3 81:23
**affect** 4:21
**affirmed** 82:4
**agenda** 51:8 53:8,19 54:8,22 61:24 62:6 68:21 73:20
**agree** 63:10 66:10 92:19
**agreed** 58:5
**agreement** 27:16 39:8 58:5 59:8,10,11,24 60:5,19,23 61:3,13,18,20 62:9,12,24 63:3 67:20 68:2,12 69:9,14,21,23 70:4,19,21 71:6 72:9,17,21 73:7 74:4,11 75:15 76:2,6 77:11 79:13 81:10,12,16 82:7,9 85:13 86:4 87:24,25 88:12 90:17 91:5 92:6,21 95:22 96:3,13,21 97:12,15
**agreements** 22:10 44:2 49:18 85:12
**ahead** 32:9 55:6 65:5 68:6 69:2 70:7 76:13
**allergy** 4:22
**allowed** 34:2,3,7 85:17
**amendment** 59:20
**Ames** 21:4,6,15 81:22 82:4,12,16,20 83:2
**amount** 30:12
**and/or** 57:18 77:19
**answers** 6:18 8:15
**anymore** 10:17
**application** 13:20
**appreciation** 58:7
**approach** 58:4
**approval** 24:7,12,16 28:20 84:7,17
**approve** 28:5
**approved** 65:17
**approximately** 14:15 29:13 57:25
**area** 12:5 16:10 20:23 26:8 31:18,24
**Argumentative** 68:25 70:6
**arrest** 10:2,7
**arresting** 6:2
**assessment** 38:7
**assistant** 10:10 11:18 43:19
**assume** 46:5

**assumed** 62:20

**assuming** 74:8 80:8

**assumption** 72:14

**attached** 49:16,19, 25 52:10 98:8

**attaching** 49:14,15

**attend** 34:10,14 41:2

**attended** 34:23

**attention** 83:12 85:4

**attorney** 7:14,15

**attorney-client** 45:13

**attorneys** 56:18 77:24 81:24 82:2 98:9

**audibly** 6:17

**August** 36:20 38:2, 12,22 40:18 45:19 51:21 53:21 57:23 59:5 60:2,11 67:24 72:5,16 74:15 75:7,9 76:9 77:9 78:22 80:7, 13,21,25 81:6 89:10 94:21 96:2 97:8

**avoid** 6:23

**aware** 26:24 34:21, 22 39:20 47:16 56:25 57:7 67:5 79:10 83:2, 25 87:13,22 91:8 92:10 94:12 95:21 97:10

**B**

**Bachelor** 9:3,6

**back** 20:25 25:20 27:12 30:20 33:12 36:17 40:18 43:10 50:2 51:19 54:17 56:19 59:14 61:23 64:4 67:13,24 69:7 70:10,22 71:8 72:12 75:4 79:17 80:7 86:9 90:10 93:10 95:25 96:24

**back-and-forth** 98:2

**background** 9:2

**backup** 6:2

**bad** 64:23

**bank** 96:22

**Barry** 19:15,16

**Barry's** 21:6

**base** 53:17

**based** 42:11 46:16 68:20

**basically** 18:3 19:13 26:8 41:7 88:21

**Ben** 92:3

**Bergey** 92:4

**Bernaski** 43:15

**bigger** 24:20

**Bill** 84:2,3

**binding** 6:11

**bit** 10:4 30:4 95:9,14

**blank** 87:2

**Blue** 12:13,18,21 13:3 25:24 26:17 29:19 34:23 35:3,7, 13,18,22,25 36:10 37:2 39:7 52:9 56:11, 13,22 57:2,16 58:2, 24 59:23 61:10 63:18,21 64:21 66:5 67:19,25 78:10 79:12,13 83:14,15 89:23 92:5,20 94:22 95:12,15

**BMSP** 94:22

**board** 33:24 34:10, 15,17,18,19,24 35:3, 5 36:9 70:11 72:3,12

**boards** 34:21

**boating** 11:2

**bold** 38:14

**book** 37:12

**boss** 20:9 77:16 82:20,21,22 85:10

**bottom** 37:25 43:14 54:20

**box** 39:10,13 40:4

**break** 37:15,16 83:7, 9,10 97:2,5

**Brian** 15:24 16:18,23, 24

**Bridge** 12:4

**briefing** 47:6,9 84:9

**briefly** 52:25

**briefs** 87:8

**bring** 94:8

**brought** 59:20 60:21

**Brusoe** 17:23 18:13, 21,24 19:2,3,21 20:7, 16 23:7 24:7,16 25:13 77:5,8 78:20 81:2,7,23 84:24 85:9 87:18 89:20,22 90:14 91:3,8 94:19

**Brusoe's** 24:7,12 77:14

**buildings** 22:17

**bullet** 62:3,5 69:8,11 73:21 85:11,22

**bullets** 62:10

**bureau** 43:19 92:3

**business** 15:6

**C**

**calendar** 8:4,22

**call** 94:24 95:2,7

**called** 4:3

**calls** 42:21 74:21

**Canoeing** 21:16

**capacity** 20:19

**capital** 12:8 22:11

**careful** 81:25

**CARSON** 6:20 23:23 24:2,9 32:8 35:19 36:14 37:11 45:11 47:24 49:5,8 51:25 55:16,19 64:16 65:2, 5 68:4,23,25 70:6 71:3 73:8 77:22 86:17,22 92:25 93:7 97:4,22 98:7

**case** 5:4 41:9 43:15 44:12

**cases** 5:16,17,20,22, 24

**caution** 77:22

**certifications** 13:15, 18,19

**certified** 13:22

**cetera** 27:6

**chain** 20:10 37:19 38:18 42:18 43:11 49:25 51:4,7 54:18 82:24 89:22 94:18

**chains** 56:5

**challenging** 56:13 67:6

**change** 13:13

**changed** 10:18 69:17 85:2

**charge** 38:5

**chase** 47:14

**choices** 64:13

**Chris** 48:22

**Chris's** 48:24

**circumstance** 65:21

**civil** 5:21

**clarify** 7:6,22 80:17

**classify** 31:21

**Closer** 36:5

**clubs** 32:3,7,13,18

**Cole** 19:17

**collecting** 38:6

**comment** 58:13 86:18

**comments** 86:20

**common** 24:4 34:9 94:7,10

**communicating** 74:2

**communication** 15:14 45:14

**communications** 15:20,21 22:8,24 23:9,12,16 57:15 74:14

**compare** 40:23

**completed** 26:18

**Compound** 64:16

**concerned** 71:6 95:17

**concluded** 98:11

**confidential** 42:10 44:21 45:2,4,10 46:8 47:15,20 48:5,10,14 49:15 50:6,15,22,24

**confirm** 49:22 55:3

**confused** 46:11 48:4 50:12,20 93:8

**conservation** 10:21, 25 11:5 13:13

**consisted** 9:16 26:8

**construction** 31:17

**consultation** 29:7

**consulted** 83:2

**contact** 92:12

**continue** 58:8,22 59:3 68:18 69:4 71:5 74:6,7

**continuing** 68:20 97:24

**contrary** 59:9

**conversation** 76:9

**conversations** 32:13 52:15 74:22

**coordinator** 22:12 28:21

**copied** 38:22 43:13

**copies** 98:9,10

**copy** 38:13 54:11

**correct** 10:6,24 13:4

14:5 22:2 26:19 27:15 30:6 31:20 51:23 52:2 53:24 54:9 55:11 59:21 63:22,24,25 65:13 68:3,22 69:12,13,15, 16 71:25 72:6 73:18, 22 74:9,17 75:18 82:20 88:23 92:23,25 94:19

**correctly** 15:9 41:23 88:7 89:7

**couple** 32:15 44:4 47:11 57:12,21

**couple-minute** 37:15

**court** 5:8,10,12,17,18 6:17,24

**courtroom** 6:13

**cover** 10:21 45:22

**covered** 12:4

**craft** 84:6,8

**create** 87:7

**credential** 9:20,22

**credentialed** 10:7

**criminal** 5:22,23

**cross-country** 33:10

**cure** 69:11 73:21 88:2 89:4,5 90:18

**current** 19:19 24:17 26:14,17

**cut** 47:14

D

**date** 67:18 72:8,23 80:7 81:18 89:14 93:17

**dates** 57:19

**day** 53:2,23 58:14 84:23 93:13

**days** 44:5

**deadline** 71:17

**decide** 75:25 76:5

**decided** 47:20 65:18

**decides** 27:12,18 66:9

**decision** 88:14 96:12,15

**decision-based** 87:15

**decisions** 28:6

**defendants'** 57:10

**defense** 10:2

**defined** 27:16

**department** 9:17 10:20 16:20 19:13 20:20 33:3,5 34:7,9 37:7 38:24 42:4 43:16 48:12,14 51:7 59:7 60:4 64:7,8,20, 22 66:9 67:8,18 68:15,16 69:14 72:16 73:6 74:4 76:4 79:11 82:7 85:15,18,24 88:11 89:2 96:5,17, 19 97:11

**department's** 59:18 64:12,13 66:8 82:5 85:16 86:5 88:22

**depend** 28:13 48:15

**depending** 14:16

**deposed** 4:24 5:11 8:9

**deposition** 5:7 7:13, 23 8:2,6,12 37:10,18 46:20 97:25 98:11

**depositions** 8:17,23

**deputy** 16:23,24 17:25 18:9,19 19:4, 10,11 21:5 81:22

**describe** 23:10 27:25 37:21 41:5 45:20 77:15

**description** 75:8

**detail** 8:14 23:15

**detailed** 61:11

**determination** 42:3 61:2,7

**determine** 29:8 60:24 72:3 85:25 96:18

**determined** 60:18 64:20 66:23 81:16

**determines** 60:4

**determining** 86:3

**development** 22:11, 12,13,15 28:11,14,21

**Devil's** 12:3,10,11 20:25 22:25 30:2,6, 12,16,17 31:4,8 32:10 34:14,15 35:12

**Diane** 17:23 18:13 78:4,7,12 81:23 82:21 84:24 89:23

**Diane's** 82:22

**Dianne** 90:9

**difference** 63:10

**direct** 14:25 15:3,17 53:7

**directly** 16:24 19:16 88:13,23

**director** 11:23 12:16 14:4,9 15:22,23 16:23,24 17:21 19:20 20:11 24:6,13 25:19 76:6 84:21,24 92:3

**disagree** 66:15

**disagreed** 30:15

**disagreements** 66:12

**discovery** 94:17

**discuss** 8:14 56:18 57:2,5 58:3,5 62:13 75:2 80:11,19 88:10 90:9 91:18 92:5

**discussed** 28:12 76:11 80:12 81:4 93:14

**discussing** 46:8 52:11 54:23 61:24 87:4 90:5

**discussion** 32:17 45:23 52:14 60:21 61:15 70:16 72:10 81:20 92:16 93:11

**discussions** 7:15 30:22 42:17 57:20

**disputes** 31:2

**dissolution** 86:3

**dissolve** 85:13

**district** 11:21 12:19, 21 16:7,9,12,14 19:24,25 20:4 25:22, 23 28:20 36:3 92:2

**division** 17:16 18:2, 4,10,13,19 19:2 36:4 80:9,15,23 81:22

**DNR** 28:23 30:15 33:18,24 34:20 43:12 48:2,5 57:16 63:11, 14,15,24 64:3 81:9, 24 87:7

**document** 40:17 46:5 49:14,19 50:9 54:24 55:15,16,17,24 56:2 83:20,23

**documents** 7:16 38:7 39:3,5,15,16,18, 21,22 40:5,12,15,22, 23 42:7,12 44:9 49:21 51:14,17 55:3 98:2,4

**downstream** 17:19

**draft** 41:18,24 45:22 47:6 49:19,21 53:13 54:22,25 55:2 89:23

**drafting** 58:10

**drafts** 42:7

**drop** 59:6 68:3,21 69:11 70:3 71:14,17, 25 72:6,8,15,23 73:5, 21 74:3 76:17,24 79:14 81:13 89:5 91:5 96:4,11 97:9

**dropped** 69:12 72:20 74:8

**dropping** 71:8

**duly** 4:4

**Durrant** 38:2,5,9,12 40:4 42:17 43:22 44:17,25 45:5 46:6, 12 51:3,6 54:21 55:25

**Durrant's** 55:15

**duties** 11:7

E

**e-mail** 37:24 38:3,10, 12,15,19,20 39:10,13 40:3,4 42:11,18 43:10,13,22 44:3 46:17 48:25 49:14, 16,25 50:13,18 51:4, 7,10,21 54:19 55:14, 15 56:5 83:13,17 85:2,7,23 89:20,21 91:23 92:11,15 93:13

**e-mailing** 38:13 52:4 85:9

**e-mails** 37:19,22 38:13,18,21,24 42:12 47:7,12 85:6 98:2

**earlier** 28:12 87:4

**early** 11:17 83:22

**easier** 37:11

**easy** 76:15

**ecological** 66:6

**edits** 52:8

**education** 9:6

**educational** 8:25

**effectively** 10:12 11:5 39:10 40:3

**else's** 8:15 60:25

**Emily** 38:20,23 44:5, 19 48:17 49:13 50:14 54:23 55:19,23

**emphatically** 82:4

**employee** 11:14 43:16 48:12,14

**employees** 14:13, 15,18 34:10 57:18

**employment** 11:12

**end** 58:20 69:24 70:8

**enforce** 11:2

**enforcement** 9:22 10:4,8,21 12:7

**enjoying** 91:25

**entail** 9:13

**entailed** 41:6

**entails** 23:11

**equivalent** 14:15

**escaped** 19:8

**essence** 41:17

**established** 85:9

**event** 85:23

**events** 27:10 33:22 74:12

**exact** 59:12

**EXAMINATION** 4:6

**examined** 4:4

**exercise** 82:6

**exhibit** 37:18 42:24, 25 43:6,7,9 45:24 46:3,11,14,19,20,23 47:16,19 49:2,5,9 51:19,21,25 54:17, 20,22 55:17 57:8 61:24 69:8 75:4 80:7 83:5,12,13 85:5 86:9, 10,12 89:19 91:20,21 93:9,10 94:14,15,17 98:10

**exhibits** 7:18,19,23 8:21 98:8

**exist** 27:7

**existing** 31:9 59:8 62:9 69:9

**exists** 69:22 97:15

**expenditure** 28:6

**experience** 33:15 34:12 94:7

**explain** 10:19 23:15

**explanation** 61:11 75:13

**extent** 27:24 45:12 74:5

**external** 28:22

F

**facing** 95:21

**fact** 77:9

**fair** 7:9 12:25 29:9 33:15 38:7 40:6 42:14 72:14 94:5

**fairly** 34:13 54:2

**fastest** 10:19

**February** 11:20 12:24,25 21:10,13

**fees** 62:11,16

**felt** 72:19 73:3

**figure** 93:16

**file** 65:20

**filed** 56:12,20

**filing** 66:16

**final** 28:5 49:23 55:4 88:14

**finally** 7:2

**fine** 4:18 35:16 49:11 71:22 86:21

**finish** 7:3 8:18 23:25

**finished** 56:8

**finishes** 23:23

**firearms** 10:3

**fish** 11:2 17:25 18:3, 20 80:9,14,23

**Fixing** 22:17

**flip** 37:14

**focused** 12:2

**folder** 38:21,23 39:4, 25 40:6 42:8,13,15 44:19,20 46:14,24,25 47:4,5 50:2,14,19

**follow** 5:23 41:9,12 67:8,9

**follow-up** 76:11

**FONSECA-ANGEL** 43:2

**force** 5:5

**forests** 14:12

**forfeitures** 5:21

**form** 6:6

**formal** 54:8

**forward** 88:14

**found** 39:14 40:15

**frank** 72:10

**Friday** 44:5

**friend** 35:3

**friends** 23:13,20 26:21,22,25 27:5,11, 14,16,21,22 28:3,6, 19 29:2,5,6,11,14,19, 21 30:2,5,9,11,14,15, 17 33:15,18,21,25 34:10,15,21,23 36:10 38:13 39:7,8 44:2 49:18 56:11 57:16 58:2,5,6,7,24,25 59:3,6,8,10,19,20,23 60:5,18 61:3,11,12, 16 62:11,15,16,19 64:5,22 65:12,17,23 66:10,13,22 67:5,19, 25 68:13 69:5,25 70:11 72:17 73:6 74:14,25 75:10 76:2, 6,17 77:10 78:22 79:12,13 80:16 81:10,12 82:6,8,9 83:21,23 85:11,12, 14,17,23 86:2 87:25 88:5,13,23 89:3,13 90:15,17,19,23 91:5 94:8 95:15,19,21 96:3,9,13,20,22 97:9

**friends'** 59:10

**front** 89:19

**full** 4:14 10:7

**full-time** 14:15

**fully** 98:3

**funding** 28:25

**funds** 27:10,23 29:8 62:11,16

**future** 58:9,22

**FWP** 80:8

G

**game** 11:2

**gave** 49:2 77:3

**general** 14:11 27:4 32:12 41:11 61:14 76:25

**generally** 5:20 23:10 25:11 26:24 27:25 28:17 37:21 77:15 79:10 87:7

**get along** 25:15

**give** 6:22 71:17

**goal** 97:8,10

**good** 4:8,9,11 22:20 24:2 25:14,18 30:10 35:21 55:21 58:25 66:10 67:10

**graduating** 11:13

**grant** 29:3 57:16

**grants** 28:19,23,24

**great** 58:25

**Greg** 36:11,20 55:13 58:3 61:15 69:18,24 75:17,20 76:14

**Greg's** 72:14

**grooming** 33:2,9

**group** 26:21,22 27:5, 14,21,22 28:3 29:2,5, 6 30:2,5,9,11,14,15 33:18 34:10,15,21,23 35:3 36:10 39:7 49:18 57:6,16 58:5,7, 25 59:3,6,8,10,19,20, 23 60:5,19 61:3,11, 12,16 62:11,15,16 64:5,22 65:12,17,23 66:10 69:5,25 72:17 73:7 74:15,25 76:2,6, 17 77:10 78:22 79:12,13 81:10,12 82:7 85:24 86:3 87:25 88:5,13,23 89:3,13 90:18,19 91:5 95:15,19 96:3, 13,21,22 97:9

**group's** 67:5 82:8

**groups** 23:13,20 26:25 27:12 28:7,19 29:11,15,21 33:15, 21,25 44:2 58:6 66:13 85:11,12,14,17 94:8 95:21

**groups'** 38:13

**Grunzwell** 26:7

**guess** 10:9,18 15:2 23:15 24:10,15 26:24 27:17,25 45:19 46:11,16 48:4,15,25 50:7,10 52:18 55:23 58:12,15 59:12 61:23 63:8,18,20 66:12 69:7 72:18 73:3,12 77:13 78:19 85:22 86:19 87:9,10 90:24 91:16 96:6

**guessing** 38:25 45:7 51:15 60:16 61:9 65:13 66:22 78:24 79:4 90:23 91:10

**guide** 52:14

**guideline** 54:4

**gun** 64:21,23 65:16

H

**hand** 37:11 46:2,19 55:7

**happen** 21:8 71:7 84:10 89:16 96:21

**happened** 11:9 12:7 71:9 89:9

**hard** 6:24 8:19 76:18 96:14

**Haren** 58:2 91:24

**head** 6:22 35:18,22, 24 56:22

**heading** 75:6,7

**Hefty** 15:24 16:18,23, 24 81:2,7

**Hefty's** 17:10

**Heil** 35:4,24 36:7,9 93:20

**Heil's** 35:5

**held** 13:18 45:23 93:11

**helps** 29:8

**hey** 62:18 65:18 69:19,20 70:20 71:13 72:7,11,22

**hierarchy** 17:16

**higher** 20:10

**hired** 11:15,17

**hold** 13:15,18 86:13

**holds** 17:3

**hope** 91:25

**hours** 9:19

**Hubbuch** 43:11

**Hubbuch's** 46:7 48:22

**hypothetical** 65:3

**I**

**idea** 66:14 93:25 94:2

**identification** 43:7 45:24 91:21 94:15

**impact** 4:23

**implies** 68:20

**impression** 76:16

**improve** 29:9

**incident** 5:5

**include** 38:24 42:8 44:22 45:6 46:9 47:20 48:18 50:16, 17,25 51:5

**included** 40:15 41:21 50:19 51:18 93:15

**includes** 47:19 66:19

**including** 85:14

**Incomplete** 65:2

**individual** 31:9

**information** 42:11 66:22,23 77:3,25 84:5,6

**initiating** 59:7

**input** 26:11,14 65:15 66:20

**inside** 17:16

**instructor** 10:3

**intend** 67:19

**intent** 92:7

**intention** 67:23 71:13

**interest** 96:18

**interfaces** 95:14

**interfacing** 23:19

**Internal** 28:24

**interpretation** 73:4, 11,25

**interrogation** 10:2

**interrogatories** 57:11 75:5

**interrogatory** 7:17

**interviewing** 9:25

**intro** 62:4

**introduce** 43:5

**introductory** 4:13

**involve** 28:17

**involved** 31:17,23 65:12 77:24 87:18

**involvement** 13:2 52:19

**involves** 23:19 28:20

**issue** 24:21 82:13,16 83:3 89:23 90:2,17 91:11,12,15

**issues** 35:17 87:9 92:9

**item** 44:20 50:14

**items** 38:23,24 87:15 93:24

**J**

**job** 9:13,14 10:9 11:3 12:17 20:13 21:6 23:10,19 78:6,25 95:18

**John** 4:15

**judicial** 56:12,19 83:16

**July** 11:22 14:8 83:14

**June** 56:15,16

**Justice** 9:17

**K**

**Karl** 35:4,5,6,15 93:15,16,17,19,20, 21,23 94:2,4

**Kathy** 26:7

**Keith** 18:9,11 81:23

**Keith's** 18:14

**Kevin** 26:5 56:21,22 83:19,22

**key** 72:25

**keyword** 39:7

**kidding** 21:21

**kind** 12:7 52:21

**knew** 8:11 62:19 79:22 91:16 92:12

**knowledge** 10:16 31:13 51:13 83:4 87:18

**L**

**labeled** 44:21 49:19 50:15 54:24

**laid** 78:9 87:24

**Lake** 12:3,10,11 21:2 23:2 30:2,6,12,16,17

31:4,8 32:10 34:14, 15 35:12

**lands** 63:18

**language** 58:16 89:11

**lapse** 13:8

**larger** 24:21

**late** 11:17

**law** 9:22 10:4,8,21 12:6

**lawsuit** 59:7,21 60:19,23 61:12 63:3, 5 64:13 65:20 66:16 67:6 68:3,22 69:4 70:3 71:8,17,25 72:6, 8,15,20 73:5 74:3,9, 10 76:17,24 79:14 81:13 91:6 95:18 96:4,11 97:9,13

**lawyer** 13:25

**lawyers** 42:13,15

**lays** 83:20,23

**lead** 26:6

**leadership** 9:25 80:9,24

**leading** 74:12

**learn** 54:16 56:8,11

**leave** 98:5

**left** 36:8 46:18 70:17

**legal** 38:25 60:9,12 61:9 62:11,16 76:3 82:8 84:20

**letter** 70:20 75:12,14, 18,21,25 89:4,13,15

**letting** 71:24

**level** 16:19 17:10 18:22 28:13,17 48:15

**likes** 49:24

**limited** 11:14 13:2 14:18

**lines** 7:2

**list** 14:22 52:5 57:19 78:10 93:15

**listed** 44:13 88:3

**litigation** 75:2 89:6 92:17,22 93:2,4

**local** 32:3

**long** 22:4,6 31:12

**longer** 35:24

**looked** 8:4,22 40:14 55:12

**looped** 37:25

**lot** 11:25 16:8 17:17 24:18 58:25 68:15

**low** 72:25

**LTE** 43:19

**lunch** 52:10

**lying** 70:4

**M**

**made** 61:6 89:24

**Madison** 4:19

**madison.com** 43:12

**make** 40:21 42:3 96:12,14 97:10

**making** 62:23 88:13

**management** 9:4 14:11 28:18

**manager** 26:5 95:11, 13

**managerial** 16:19

**mandated** 9:17

**mark** 46:2 94:13

**marked** 37:10 43:7 45:24 91:21 94:15

**master** 20:24 25:24 26:6,15,18 56:13 64:9 65:7,10,11,12 70:15,16 92:6,20

**match** 29:3

**matter** 63:4 72:24 86:19

**meant** 80:17

**media** 23:17

**medications** 4:20

**meet** 24:18,23 52:9, 10 77:18,19 78:7 90:15,23 92:4,8 93:16,17

**meeting** 23:17 34:17,18,24 36:17,20 45:16,19 49:20,22 52:16,22,24,25 53:2, 3,8,11,22 54:3,5,6,8, 12,14 55:2,4,6,7,10 56:2 58:2,4,21 59:5 60:2,11 61:23 62:13 69:25 70:8 71:20 73:2,15 74:2,5,13,15, 19,23 75:2,9,11 76:10,11,16,23 77:5, 9,14,18,21 78:5,9,13, 22 79:2 80:3,9,11,13, 16,19,20,21,22,24 81:2,3,4,5,8,22 82:4, 12,18 83:3 84:3 89:10 92:16 93:14,21 94:2,4,7,9 96:2 97:8

**meetings** 20:8 25:4, 6,8 34:10,15,19 36:12 42:21 77:23,25 78:4,16

**member** 5:6 32:18 33:24

**members** 35:3 36:10 74:25

**mentioned** 86:10

**mess** 21:23

**met** 36:11,19 52:25 53:21 57:24 58:14 76:14 80:10,18

**mind** 83:6

**minor** 89:24

**minute** 52:6

**minutes** 57:25 80:10,19

**Misstates** 68:4

**Missy** 15:8 16:19 38:14 46:18 48:12,19 51:13 52:13,19,22 53:17 54:19,23,24 55:24 57:23 60:8 61:6,9 74:19,22 75:11,17,20 76:22 77:19 78:4,21 80:10, 18 82:15 83:14,19 85:7 90:10 91:23 92:10 93:13,21

**Missy's** 48:11 60:7 79:8 85:8 93:25

**modify** 88:4 90:18

**modifying** 88:11

**Monday** 85:8

**money** 22:18 27:12, 14,15,18,19 29:6,15, 22 30:12 62:19 96:21

**monies** 62:25

**monthly** 5:18

**morning** 4:8,9

**Mound** 12:13,18,21 13:3 25:24 26:18 29:19 34:23 35:7,13, 18,22,25 37:2 39:7 52:9 56:12,13,22 57:2,16 58:2,24 63:18,21 64:21 66:5 67:19,25 78:10 79:13 83:15 89:23 92:6,20 94:22 95:12,15

**Mound's** 35:3 36:10 59:23 61:10

**move** 54:17 88:14

**moved** 31:21 66:25 89:25

**multiple** 75:11 78:7 85:14

### N

**natural** 9:3 10:20 12:4 19:12 20:20 64:20

**necessarily** 10:22 29:24 69:3

**needed** 32:16

**negotiation** 28:2

**news** 23:17

**nice** 76:15

**nods** 6:23

**nomenclature** 17:17

**non-recognized** 69:4

**noon** 52:9

**note** 25:2 79:8

**notes** 6:20 41:24 42:7 44:21 45:2,4,10, 16,18,19 46:8,19 47:15,20 48:5,11,14 49:15 50:6,11,15,22, 23,24 51:9 52:7,11, 13,19,24 53:10,19,22 54:2,7,11,14 55:6,10 61:24 79:8

**notice** 67:18

**nowadays** 10:22

**number** 5:12 17:6 18:3 19:13 29:24 38:23 57:14 88:18 96:17

**numbers** 47:25 50:3 75:5

### O

**oath** 4:4 6:8,11

**object** 45:11

**objection** 24:9 32:8 35:19 64:16 65:2 68:4,23 70:6 71:3 73:8

**Occasionally** 5:21

**occur** 34:12

**occurred** 40:7 57:17 75:9 81:3 83:4

**occurring** 77:6

**October** 81:21

**offer** 68:16

**office** 23:16

**officer** 5:17 6:2,5 9:10,20,22 10:6,13, 23 11:6 13:6,17

**one-on-one** 25:6

**open** 37:23 43:23 84:3

**operating** 44:2

**operations** 14:11 15:5

**opinion** 90:22 97:14

**opportunities** 86:2 88:3,6

**opportunity** 65:14 88:2 89:4 90:18

**opposed** 85:21

**option** 65:9 68:8 87:24 88:3,4 90:11, 14,25

**options** 70:12 87:23 90:16,22

**ordering** 98:10

**original** 50:13 98:8,9

**outline** 85:13

**overzealous** 93:23 94:5

**owns** 63:24

### P

**packets** 7:21

**paged** 7:21,23

**paragraph** 52:7 88:16,17,18,25

**paren** 43:25

**parentheses** 57:24

**park** 9:11 10:10,12, 15,22 11:6,14,16,19, 21,24 12:3,4,5,13,14, 18,19 13:3 14:19,23 20:23 23:2 25:22,23, 24 26:5,15 27:15,18, 20,23 28:3,6 29:7,9, 22 30:16 31:5 35:8, 13,18,22,25 37:3 56:12,14,22 57:17 58:3 63:6,11,15,21 64:3,14,15,22,23 65:24 66:5,6 67:19, 25 68:14,16 83:21,24 92:2,8 94:22 95:12, 13

**parks** 11:23,25 12:2, 10,17 14:4,9,12 15:23 17:11,12,16,21 18:2 19:20 20:11 22:18 23:22 24:6,13 27:2 29:16 43:20 76:5 80:14,23 84:22

**part** 16:10 44:6,17 58:20 63:14 72:15 73:5 74:8 97:12

**partners** 15:14 23:20

**partnership** 15:4,14, 21 22:8,24 23:9 58:8, 22 74:6 88:4 90:19

**partnerships** 22:10 23:12

**passing** 8:11 43:21

**past** 13:17

**pending** 95:18

**people** 6:25 14:17 42:3 52:6 73:25 93:15 94:8

**period** 20:11

**periodic** 9:23,24

**permanent** 11:16

**person** 92:4

**person's** 18:16

**personally** 26:11 35:2 74:16 96:2,5

**perspective** 16:18 27:8

**Pesticide** 13:20

**petition** 56:12,19 57:2 83:15,16

**phone** 42:21 74:21

**phonetic** 26:7

**picnic** 28:14

**place** 44:18

**plaintiff's** 57:11

**plan** 20:24 26:6,12,18

52:24 56:13 64:9 65:7,10,11,13 66:18 70:15,16 77:20 84:7, 8 87:5 92:6,20

**planner** 20:20,22

**planning** 25:25 65:8 66:18,19 67:6,9

**plans** 26:15

**point** 50:7 55:21 60:13 61:17 62:3,5, 23 65:18 84:21 85:22 88:20 96:16

**points** 53:10,14,16 58:4 85:10

**police** 6:5 9:9 10:6, 13,23 11:6 13:5,17

**policies** 87:9

**policy** 15:6 34:7 84:9,13,18 86:10,11 87:3,8,19 90:3

**portion** 11:6

**position** 13:11 14:14 15:24 16:2 36:7 38:7 59:19 64:3 66:8 81:7, 9 82:5 85:16 86:5 88:22

**possession** 47:17

**possibility** 69:22 76:21 79:22 81:18 88:11 89:3,12,16,17 91:4,7,8,17 97:15,24 98:5

**possibly** 84:10

**potential** 24:21 57:19 95:22

**potentially** 39:15 71:9 72:21 84:20 87:16

**POTTS** 4:7 6:21 23:24 24:3,5,10,11 30:20,24 32:11 35:20 36:15,16 37:9,13,17 42:24 43:4,8 45:17, 25 48:3 49:11,12 52:2,3 55:18,21,22 59:14,17 64:17,19 65:4,22 67:13,17 68:9 69:6 70:22 71:11 73:10,14 78:18 79:16,23 83:8,11 86:8,16,19,23,25 91:13,14,20,22 93:5, 9,12 94:13,16 96:25 97:6,7,17,20,23

**powers** 10:7,8,13

**practical** 16:18 27:8

**Prairie** 12:5 20:23 31:18,24

**preference** 68:11,17

**preparation** 7:25 8:23

**prepare** 7:13

**prepared** 52:13

**preparing** 83:22

**presence** 96:8

**president** 58:3 88:13,23

**Preston** 19:17

**pretty** 8:3,12 25:15

**previous** 7:23 78:14

**previously** 9:9

**primarily** 10:4 12:3 33:9 53:18

**primary** 11:3 12:9

**prior** 12:25 18:9 19:19 20:17 21:5 22:10 40:13 52:16 53:21 57:25 60:2,10 68:4 74:15 77:6,8,14, 18 82:18 83:3 88:13 95:25

**privileged** 42:10 45:13

**problems** 72:25

**procedure** 5:23 41:8,9,11

**procedures** 67:9

**proceeding** 8:7,10

**PROCEEDINGS** 4:2

**process** 25:25 26:10 28:2 44:9 65:8,10,11, 13 66:19,20 67:6,10

**processes** 66:21

**produce** 51:8

**produced** 42:19 46:6,12 47:17 94:17 98:3

**professional** 11:12 36:12

**program** 23:14 29:3 43:19 87:17 88:10 92:3

**program's** 85:25

**progress** 41:25

**project** 22:16

**projects** 22:13,19 24:23 29:5

**promoted** 11:22 13:10 15:25

**properties** 11:4 12:6,11 27:7

**property** 11:18 26:23 59:2 60:6 61:16 63:17,22,24 64:5,14 65:24 66:10 67:11 95:11,13

**protocol** 87:12

**provide** 26:9 41:13, 19 45:4 61:10 65:15 77:24

**provided** 45:2 58:13 66:22 67:18 98:9

**providing** 23:17

**provisions** 61:18

**public** 23:18 38:5,6 40:10 41:3 42:4 43:22 44:10 66:20

**publicly** 85:15,17,24

**purposefully** 39:21

**put** 40:5 42:12,15 46:14 52:19 53:7 64:21 75:13 84:15 97:23

**putting** 53:18

## Q

**qualify** 33:20

**question** 7:3,5,7,10, 11 8:19 25:17 30:19 42:10 47:22 59:12 67:14 70:22,24 73:3 97:6,19

**questions** 4:13 6:16 39:2 50:4 54:22 57:12,22 84:12 92:7, 21 97:3

**quick** 83:7 97:2

**quote** 41:16 43:25 83:19

**quotes** 70:2

## R

**R-Y-A-N** 18:17

**raise** 27:11,12

**raised** 29:15 30:11

**raises** 27:14 29:6,22

**Raising** 27:10

**range** 64:21,23 65:16

**ranger** 9:11 10:10,12 11:7,14,16,24,25 12:13

**rangers** 10:15,22 14:19

**rarely** 32:25

**re-review** 40:12

**read** 30:20,21 59:14, 15 67:13,15 70:22 71:2 79:17,20 88:7, 21 89:7 93:8

**reading** 85:19

**reason** 94:4

**reasonable** 73:4,11, 24

**reasons** 63:2 85:14

**recall** 42:23 45:3 51:12 72:10 75:3 78:3,15 79:9 90:24

**recalling** 98:5

**receive** 89:3,13

**recent** 21:11

**recognize** 37:19

**recollection** 46:3,24

**recommendation** 88:10

**record** 7:22 30:21 41:19 45:23 49:16 59:15 67:15 71:2 79:20 93:11 97:24

**records** 37:23 38:5, 6,15,19 40:10 41:3, 13,14 42:4 43:22,23, 24 44:6,10,16,18 46:12 49:17,21 55:3

**recreation** 9:4 12:5 20:23 31:18,24 43:20

**recreational** 11:4

**redlines** 47:9

**refer** 37:9 47:24 54:14

**referencing** 43:25

**referring** 26:22 48:21 50:3 55:19 75:14 80:20 87:4

**refresh** 46:3

**refreshes** 46:23

**regular** 5:23

**reiterated** 82:5

**related** 12:10,18 13:17

**relation** 25:24

**relations** 23:18

**relationship** 22:20 25:13 26:23 30:8,14 32:5,6 35:15,21 37:5 59:4 68:18,20

**relative** 65:20

**relay** 58:7,21

**release** 49:21 55:2

**released** 39:2 48:20

**releases** 23:17

**relying** 60:25

**remember** 6:16,22 14:7 19:7 40:20 41:23 42:6 44:14 45:8,10 47:3 56:5 80:12 95:4,6

**remind** 12:22

**replacing** 92:3

**report** 14:24 15:11, 17 17:22 18:24 19:3

**reported** 26:6

**reporter** 6:17,24 43:12 49:7

**reports** 14:25 15:3 19:16 22:2

**representative** 96:5

**request** 37:23 38:6, 16 39:6 40:10,18 42:22 43:11,23,24 44:10 46:7,13 48:22, 24 51:14 57:14,21

**requested** 93:16

**requesting** 49:17

**requests** 41:3

**require** 13:11 68:21

**required** 67:9

**resource** 9:4 68:14

**resources** 9:3 10:20 19:12 20:21 64:20

**respond** 55:14

**responded** 38:17,22 44:4,17 55:5,24,25

**responding** 41:3

**response** 46:7,12 48:22 51:14 54:21 57:14 58:11,15,20 82:3

**responses** 6:22 57:10,12 75:4

**responsibilities** 12:9,17 16:3

**responsibility** 11:3 16:10 18:15,20 85:25

**responsible** 53:18

**responsive** 39:16 49:16 57:20

**restate** 24:10

**retired** 18:12 21:17

**retiring** 14:17

**review** 7:16,25 8:6, 22 39:24 55:6 56:12, 19 58:15 60:2 62:9 69:9 83:16

**reviewed** 59:23

**reviewing** 47:3 87:19

**ride** 32:20,24

**rights** 82:6

**risks** 86:2 88:2,6

**river** 21:16,19

**roads** 22:17 31:9

**role** 15:13 16:15 17:24 19:20 20:6 22:25 24:6,13,17 25:23 26:3,8,14,17 28:11 30:5 33:12 35:9,13 40:9 43:17 58:10,12 76:5 77:14

**roles** 17:4 30:6

**roughly** 11:11 14:7, 13 21:8 29:11,14,19 31:7 34:17

**run** 24:16

**Ryan** 18:15,18,21

## S

**S-C-H-M-E-L-Z-E-R** 4:17

**Sarah** 19:6,10,15 21:6

**Sauk** 12:5 20:23 31:18,24

**scheduling** 92:9

**Schmelzer** 4:1,3,15 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1,23 92:1,2 93:1 94:1 95:1 96:1 97:1 98:1

**schooling** 13:25

**Science** 9:3,7

**scope** 83:20,23

**Scuba** 13:22

**search** 39:11 44:9

**searched** 39:14 40:4 44:13

**searching** 39:4

**seasonal** 11:16

**secretary** 19:4,11 21:5 81:22

**section** 15:3,4,5,15, 16,21 16:4,6,11 17:3 22:8,24 23:10 25:8, 20 42:4 60:8 78:13

**seek** 84:7,17

**sees** 90:25

**send** 75:25

**sending** 75:12 92:10

**sense** 19:23

**sentence** 84:2 88:9, 21,25

**September** 43:14 44:4,20 50:13 54:21

**serve** 12:13 33:24

**set** 74:19,23

**share** 58:6 89:2

**shares** 18:15

**sheet** 47:7,9

**shelter** 57:25

**short** 20:11 75:7

**sign** 58:18

**signed** 59:11

**significance** 24:20

**significant** 30:11,25 33:14

**similar** 25:8 35:13

**sir** 10:14 21:14 92:13

**sitting** 6:12

**situation** 64:24,25 84:18

**ski** 33:2,9,10

**slightly** 31:21 52:9

**snowmobile** 31:4, 12,18,23 32:3,6,13, 18,22 33:3 36:25 57:5 64:11 65:21,25 66:5,24 67:3

**snowmobiles** 31:10 32:20,24 33:5

**socialize** 23:5

**sort** 5:13 14:21 17:6, 18 23:18 24:23 43:9 44:12 52:22 87:2

**sounded** 9:9

**sounds** 6:15 8:21 10:5 33:14 50:16 53:17 89:12

**South** 4:19

**southwest** 11:21 12:19 15:22 16:13,14 19:25 20:4 23:2 25:20 35:10 36:3 92:2

**speak** 13:8 85:17,24

**speaking** 58:4 85:14

**specific** 5:16 9:14 26:23 32:10 58:15 61:17 63:17 70:23 78:3,8,16,19 87:12 92:9

**specifically** 60:12, 22 62:25 69:25 78:5 82:3 87:10

**Speerschneider** 36:22 37:6 57:3

**spell** 4:16 18:16

**spend** 62:25

**spending** 22:18 62:11,16

**spent** 27:18

**spoken** 36:22 37:2

**sponsoring** 27:10

**staff** 5:6 38:25 60:6 76:4 96:18

**staffing** 60:7

**start** 4:12 15:2

**started** 11:14 12:24 74:5

**starting** 11:4 43:9

**starts** 75:8 88:18

**state** 11:23 12:3,4,5, 11,14,17,18 13:3 14:4,9,12,23 15:23 16:10,11 17:12,16,21 19:20 20:23 22:12,14 23:2 24:6,13 25:24 26:15 27:2 30:16,19 31:5 35:8,13,18,22, 25 37:2 56:12,13,22 57:17 58:3 63:21,25 64:2,21 66:5 67:19, 25 76:5 82:3 84:21 94:22 95:12 96:24

**states** 57:14

**step** 72:5

**steps** 60:10 72:4

**Steve** 49:17 75:11 91:25 92:4

**Steven** 4:1,3,15 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1

15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1, 14 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1

**sticker** 49:6,9

**stood** 57:24

**strike** 33:12 51:5

**strong** 89:2,12,17

**stronger** 89:12

**structure** 14:23

**stuff** 4:22

**subject** 83:15

**submitted** 43:24

**subset** 61:22

**sue** 64:5,8,10

**sued** 5:6 63:8 64:7, 22

**suit** 69:12 73:22

**summarize** 8:25 45:12 54:2

**summary** 40:6

**summer** 91:25

**summons** 49:14

**superintendent** 9:11 10:10,11 11:18, 19 27:20

**supervise** 33:18 36:6

**supervises** 16:6,7

**supervising** 16:15

**supervision** 33:20, 23

**supervisor** 11:21 12:19 15:5,6,7,15,21 16:2,4,12,14,16 17:3 19:24 20:2,4 22:9,24 23:3,10 25:21,22,23 26:7 28:3,11,21 29:8 35:11 36:4 84:19 92:2

**supervisors** 15:4,16 16:7,8,9 25:9

**support** 58:6 61:16 63:4,9 64:14 96:2

**supported** 91:4

**supporting** 63:6 65:19

**suppose** 66:7

**supposed** 41:19

**Swenson** 26:5 56:21 95:9,14

**Swenson's** 95:17

**switch** 21:8

**sworn** 4:4

**system** 14:23

T

**T-A-M-I** 18:17

**table** 28:14

**taking** 4:20 19:19

**talk** 8:9 24:19,21 32:4,12 40:17 44:25 51:3,6 52:23 70:10, 11 71:15 72:3,13 74:12 76:23 77:5,8, 19,20,23 78:10,21 81:25 88:22 89:25 92:8 94:21,25

**talked** 40:20 51:11 52:20 53:14,15 59:9, 16 60:12,14,15 61:14,15 62:10,17 68:13 69:18 70:9 71:18 72:22 74:11 76:22 78:5,12,16,17 79:5 80:6,21 81:17 82:2,13,15,17 94:3 95:9 96:16,17

**talking** 6:23,25 30:17 45:20 47:25 50:18 53:10 55:12 63:17 72:5 79:3 80:3 83:14 84:12 86:9 90:14,21

**Tami** 18:15,18

**team** 80:9,24

**telephone** 51:12

**telling** 61:5

**term** 11:14 14:18

**terminate** 67:20 70:3,19 71:14 72:9, 17 73:6 74:4 75:15 76:6 81:10,12 87:24, 25 90:17 96:8,13,20

**terminated** 68:2,8, 10 69:14,22 72:21,23 81:17,19 97:16

**terminating** 67:23 69:19,23 70:21 75:25 79:11,12 88:12 91:4 96:3

**termination** 43:25 44:14 49:17 57:15 59:8 82:6 89:4,14,15 95:22

**terms** 39:6,8,11,14, 19 44:13

**testified** 4:5 5:7,10, 14,24 55:9 67:24

**testify** 4:21 5:8 6:9 69:24 77:25

**testifying** 5:25

**testimony** 68:5

**text** 94:18

**thanked** 75:11

**thanking** 75:17

**thing** 50:8 51:2 63:16 79:18

**things** 12:7 24:24 41:21 59:2 87:9

**thinking** 74:3 90:15

**thinks** 65:23 84:2

**thought** 39:15 61:12, 18 63:2 69:20 73:12 76:12,20,24 77:9 80:22 81:5 97:11

**time** 5:14 9:17 13:16 20:11 21:24 31:15 32:25 36:5,19 47:21 65:15 66:23 71:13 76:20 77:16 82:12, 15,23 88:5 90:20 91:9,13 95:23,25

**times** 5:2,10,12 32:15 75:11 78:8

**Timm** 36:22 57:3

**title** 10:9 15:19 95:10

**today** 4:10,21 6:8,12 7:13 69:20 86:6 98:4, 6

**Todd** 21:4,6 81:22 82:4

**told** 8:11 67:25 74:25

**tomorrow** 71:14

**top** 29:20 83:13

**topic** 92:16

**topics** 45:22 78:11

**total** 29:17

**track** 47:10 48:6

**trail** 31:4,7,10,12,18, 19,21,22,24 64:11 65:21,25 66:5,24 67:3

**trails** 14:12 22:17 33:2,3,4,9,10 36:25

**train** 41:11

**trainer** 5:6 6:4

**training** 9:10,14,16, 18 10:4,16,23 13:25 41:2,6,15,16

**trainings** 9:24,25

**transcript** 4:2 79:19 93:8 98:9

**transcripts** 8:6

**transition** 78:12

**transitioned** 10:20

**treat** 82:8

**truthfully** 4:21 6:9

**turn** 83:5 85:4 86:8 93:9

**turning** 69:7 83:12 85:22

**tweak** 52:8

**typically** 25:6 32:15 84:18

U

**Uh-huh** 57:9 90:6 92:12

**understand** 6:8,11 7:5,6 14:23 17:14,18, 19 19:9 24:15 27:4, 17 52:18,22 63:20 68:19 69:7 77:13 78:20 97:12

**understanding** 24:14 27:5 29:24 34:6 42:2 58:12 63:19 91:3

**understood** 7:10

**University** 9:4

**update** 26:9

**updates** 9:18,23

**upload** 39:18 51:13

**uploaded** 38:23 39:3,16,24 40:12,23, 24

**uploading** 40:13,21

**upstream** 17:20

**usual** 20:8

**utilize** 29:5

**UW-MADISON** 11:13

V

**vacancies** 14:16

**vacant** 18:7

**Vague** 24:9 32:8 35:19 64:16

**valuable** 68:14

**Van** 58:2 91:24

**Vanlanduyt** 15:8,10, 11 16:19 21:23,25 22:2,4 23:5 25:4,17 38:17 39:24 40:17 51:22 52:4 55:5 76:10 81:3,8,24

**Vanlanduyt's** 23:9 55:14

**varies** 14:16

**verbal** 6:22

**version** 49:23 55:4 86:12

**viability** 66:6

**viable** 65:9

**vice** 58:3

**view** 63:15,21 64:12 65:4

**violated** 60:5,19 61:12

**violating** 59:19 61:19 63:3 76:7 77:10

**violation** 61:2,21 69:21 74:11 82:8 97:11,13,14

**vis-?-vis** 20:6

**visitors** 68:16

**voice** 85:20

**volunteering** 27:10

**volunteers** 32:3 33:22

**vote** 34:20

W

**wait** 23:23 36:14

**walk** 43:9 74:2

**wanted** 55:3 58:21 64:21 65:19 71:5,15 80:17 85:6 94:21

**warden** 10:25 13:13

**wardens** 10:21 11:5

**Warnke** 18:9 81:23

**warranted** 86:4

**water** 92:14

**ways** 60:17

**Webster** 4:19

**Wednesday** 44:3 54:20

**week** 24:19 71:19 78:8 83:22 92:5

**weekly** 24:19,23 25:6,11

**weeks** 78:6,25

**Wiegand** 58:3

**wildlife** 17:25 18:4, 20 80:9,14,23

**Willi** 36:11,19 52:5 55:12 61:15 69:18,24 72:14 74:22 75:17,20 76:14 84:4 91:24 92:11 93:15

**Wisconsin** 4:19 11:23 12:16 14:4,9, 12 19:20 21:20 24:6 26:25 29:12 63:25 64:2

**Wisconsin-madison** 9:5

**wondered** 76:20

**wondering** 49:19 54:25 55:24

**word** 46:6

**words** 40:4,5

**work** 4:18 20:22 22:7 27:20 33:21,23 37:6 68:12,17 71:5 74:7 76:15 86:23 96:9

**worked** 11:4 19:21 20:16 22:4,23 30:4 38:9 47:7 65:10

**working** 22:9,20,25 23:12 24:24 25:13 30:8,14 33:15 35:7, 12,15,21 83:20

**works** 23:16 60:8

**write** 6:25

**writing** 75:16

Y

**year** 9:19 11:22 32:15 34:18

**yearly** 9:18 41:7

**years** 5:15,18 9:20, 23 11:11 12:22 22:5, 7 31:14 32:7,14 33:2