IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

FRIENDS OF BLUE MOUND STATE
PARK,

        Plaintiff,

   v.                          Case No. 21-CV-00676-JDP

WISCONSIN DEPARTMENT OF
NATURAL RESOURCES ET AL.,

        Defendants.

## RESPONSE TO MOTION TO COMPEL

### INTRODUCTION

Plaintiff Friends of Blue Mound State Park (Friends or Plaintiff) has filed a motion asking this Court to compel Defendants Wisconsin Department of Natural Resources (DNR or WDNR) and Melissa Vanlanduyt and Steven Schmelzer (collectively Defendants) to re-conduct searches of documents and emails that led to the location, review, and production of tens of thousands of documents/pages. The Friends' reason for this onerous and unduly burdensome request is because they (or their counsel) hold a mistaken belief that Defendants have failed to conduct a careful and thorough search and/or is hiding evidence because two emails between DNR staff responding to a public record request from a newspaper reporter were missed during production and then voluntarily produced during the deposition of Diane Milligan.

First, the fact that the two emails (dated September 8, 2021 emails at 2:19 and 3:09 between Van Landuyt and Emily Durrant discussing 21PRR8841) were

voluntarily produced as soon as it appeared that the Friends might not have the emails weighs heavily against the Court ordering Defendants to conduct a "do-over" at great time and expense to the State.

Second, the Friends' own conduct led to the occurrence of this scenario. From the outset, the Friends "hid the ball" regarding the source of the alleged August 5th "silver bullet" draft agenda [DNR refers to this document as draft meeting prep notes]. For the first time, during the deposition of Katherine Walker, the Friends produced an email from reporter Chris Hubbuch, who had shared the response to his public records request (21PRR8841) with the Friends. DNR records' staff Emily Durrant had provided an August 3, 2021 Vanlanduyt email and draft meeting prep notes in response to Hubbuch's request (21PRR8841). Durrant unintentionally forwarded the August 3, 2021 Vanlanduyt email to Hubbuch with the draft meeting prep notes imbedded in the email. Durrant's intention was to provide the email only and withhold the draft meeting prep notes, as was clear in discussion contained in the two "missing" emails that DNR produced during the Milligan deposition.

DNR records staff handles thousands of public records requests per year and could never remember every request and record. [1] The Friends contend the draft agenda provided to Hubbuch in response to the 21PRR8841 request and the Durrant/Vanlanduyt email exchange discussing this records request was very important evidence. Yet, the Friends failed to identify Hubbuch as the source of the

---

[1] DNR Public Records Coordinator Katherine Walker testified that DNR staff handled 5,700 public records requests in 2021. (Walker Dep. 34.)

2

draft agenda or the relevance of the 21PRR8841 request in its Initial Disclosures. If DNR knew that a public record request, buried in the 5,700 requests submitted and responded to in 2021 was relevant to this case, staff could have searched for Hubbuch or 21PRR8841. Instead, the Friends served vague and overly broad discovery requests defining every DNR employee across the State as "you" and asking about termination of Friends agreements, snowmobile trail planning, litigation involving other Friends groups, and every conversation that might mention these topics over the last five years.

DNR appropriately narrowed the requests, identified employees who may have relevant documents, searched, reviewed and winnowed out tens of thousands of irrelevant documents that "hit" on the overly broad search terms, matched them up to the interrogatory and/or RPD number, and timely produced thousands of well-organized documents. Now the Friends come before this Court complaining that DNR missed two pages--two pages that easily would have been found and produced initially had the Friends simply asked for Hubbuch-related or 21PRR8841-related documents. Instead, after the Walker deposition, Vanlanduyt sent those emails to counsel specifically related to the 21PRR8841 request noting that she had no memory of that request. Counsel assumed the documents already had been produced, as the Friends marked part of that chain during the Walker deposition. (Ex. 10.) [2] It was not until the Milligan deposition that the DNR learned that the two pages might not

---

[2] Throughout this response, citations to numbered exhibits refer to deposition exhibits filed herewith.

3

have been included in the thousands of pages of records that were turned over. Undersigned counsel immediately forwarded those two pages to Friends' counsel.

The Friends entire motion to compel balances on a single draft agenda [draft meeting prep notes] to which they were not entitled back in August 2021 and two emails discussing a different public records request. The Friends did not disclose that the draft agenda came from Hubbuch and did not mention him in the Initial Disclosures. Plaintiff cannot now complain to the Court that what it really wanted was documents related to a specific public records request made by Hubbuch so DNR should re-do all the searches and work that went into providing responses to discovery. Discovery rules do not demand perfection and two pages do not warrant a "do-over." The Friends motion to compel should be denied.

## RELEVANT FACTS

### A. DNR's Responses to Public Record Requests 21PRR8808 and 21PRR8941.

When DNR receives a public records request, folders are created for staff to upload responsive documents. The assigned records coordinator reviews the documents provided by staff and sorts them as to whether they will be produced or withheld, based on not qualifying as records (i.e., drafts), statutory exceptions, or privileged documents. (Ex. 3; Walker Decl. ¶¶ 3-4; Walker Dep. 26-32.)

Emily Durrant was the DNR public records person who responded to 21PRR8941 made by the newspaper reporter, Chris Hubbuch, and the initial partial response to 21PRR8808 made by the Friends in August/September 2021. (Walker

4

Decl. ¶ 4; Ex. 3, 4, 5, 12, 58.) Durrant had several years of public record response experience as of August 2021. (Durrant Dep. 7.)

Regarding 21PRR8808, Durrant was assigned the Friends' request and requested relevant records from DNR staff on August 19, 2021:

I've been assigned to coordinate a public records request for the following records:

"Copies of public records, including any internal correspondence or any other written documentation, related to the August 5, 2021 meeting between representatives from the Friends of Blue Mound State Park and WDNR officials. In particular, I am requesting records of communications involving DNR Parks Director Steven Schmelzer and Recreational Partnerships Section Chief Missy Vanlanduyt from June 25, 2021 to present including the key words "Blue Mound," "Friends Group," "Friends," "Agreement," "termination," "meeting," "Bill Van Haren," "Willi Van Haren," "Karl Heil," "Gregory Wiegand," or "snowmobile." I am also requesting records of any communications involving DNR employees or officials during the same time period containing the terms above."

Sara: Could you let me know if you have any Parks records for this request?
Missy and Steven: Could you let me know if you have any email records for this request?

Please let me know if you think there are any additional staff that should be included in the records search for this request

(Ex. 4 at 2-3.) On August 19, 2021, Durrant and Vanlanduyt communicated about responsive documents Vanlanduyt had uploaded to the record collection folder for 21PRR8808 on that same day. Vanlanduyt indicated that two of the documents in the folder were notes and never distributed at a meeting [meaning they are drafts, not public records]. (Ex. 3; Walker Decl. ¶ 6.)

Regarding 21PRR8841, Durrant was assigned Hubbuch's request on September 1, 2021:

I've been assigned to coordinate your public records requests for the following records:

"Please accept this request for any records referencing termination of operating agreements with friends groups since 2010."

(Ex. 12 at 2.)

On September 8 and 9, 2021, Durrant communicated with Vanlanduyt regarding the records responsive to 21PRR8841 and learned the draft should be withheld. (Ex. 10, 58.) On September 9, 2021, Durrant provided Hubbuch with the response to 21PRR8941, where she explained that she was attaching one responsive record (the 8.4.21 email) and withholding draft documents (the attachment to the 8.4.21 email).

The Wisconsin Department of Natural Resources has concluded its search and located a record responsive to your request. The responsive record is attached to this message.

Drafts of documents are not being produced because drafts are not records as defined in Wis. Stat. § 19.32(2). *See Schill v. Wis. Rapids Sch. Dist.*, 2010 WI 86, ¶ 71.

(Ex. 12 at 2-3.) Walker noted that the document that Durrant thought she was producing was the 8.4.21 email. Unfortunately, the draft meeting prep notes was imbedded in the email attachment that Durrant forwarded to Hubbuch, and Durrant did not notice that. The email to Hubbuch mistakenly included both the 8.4.21 email and the draft meeting prep notes attachment. (Walker Decl. ¶¶ 10-11.) Durrant testified as follows:

> Q: When you reviewed the 8941 request, you testified previously that you asked Missy whether or not that [the attachment to the 8.4.21] was a draft?
> A: Yes.
> Q:And based on Missy's response, you had responded that you would withhold that draft. · Do you remember seeing that?
> A:Yes.
> Q:And in response to the 8941 request to the newspaper, did you withhold that draft?
> A: I meant to, but I believe it went out.

6

\*\*\*

Q: So is it your testimony that the 8941 response that you sent out where you included both the email and the draft, the draft was a mistake to send out?
A: It was a mistake.

(Durrant Dep. 28-29.)

On September 9, 2021, the Friends sent another request for documents. Durrant responded that she was working on the request. (Ex. 12 at 6.) On September 14, 2021, Durrant provided a partial response to 21PRR8808. (Ex. 12 at 5.)

A screenshot of the 21PRR8808 DFT (draft) folder kept by DNR regarding the 21PRR8808 request shows the documents that were in the folder and identified as drafts by Durrant.



Based on the folder above, it is evident that upon receiving the 21PRR8808 request from Durrant, Vanlanduyt uploaded potentially responsive documents in the specified folder in August 2021. Durrant then made the decisions to withhold the documents. The "Date modified" shows the documents were placed into the 21PRR8808 folder by Vanlanduyt and moved into the DFT (draft) folder by Durrant. (Walker Decl. ¶¶ 6-8.)

7

The very first email in the folder screenshot (titled "Blue Mound") has the document titled "Blue Mound_Friends_Meeting prep notes_DRAFT_20210803" (the document the Friends refer to as the Agenda and Defendants refer to as draft meeting prep notes) attached to it. Durrant should have produced the 8.4.21 email only, not the draft meeting prep notes attachment.  Then, in the 21PRR8808 response, Durrant overlooked providing the 8.4.21 email to the Friends. (Walker Decl. ¶ 9.) Neither the 8.4.21 email nor the draft meeting prep notes were included in the September 14, 2021 response to the Friends' 21PRR8808. Durrant testified as follows:

> Q: And so your intent was to produce the email but not the draft in the 8941?
> A: Yes. I must have missed it.
> Q: And in the 8808 was it your intent to produce the email but not the draft as well?
> A: Yes.

(Durrant Dep. 30.) In response to both 21PRR8808 and 21PRR8841, Durrant should have provided Vanlanduyt's email, but not the draft meeting prep notes as it was not finalized or used and thus was not a record under public records law. (Walker Decl. ¶ 12.) Durrant's last day of work for DNR was September 24, 2021. (Durrant Dep. 5.)

On October 7, 2021, Walker provided additional responsive documents to the Friends' request, 21PRR8808, because Durrant was no longer employed by DNR. (Ex. 7.) By email dated October 8, 2021 at 9:52a.m., the Friends complained about the DNR public record response missing an email/agenda that the Friends had received from an "unnamed source." (Ex. 8 at DNR_009520.) By email dated October 8, 2021 at 4:29p.m., DNR Attorney Mark Herman provided additional documents that had not been provided as a courtesy (including the documents at issue here—the August

4, 2021 at 10:31 a.m. email between Vanlanduyt and Schmelzer and the attached "Blue Mound Friends Meeting prep notes DRAFT 20210803" (Ex. 8 at DNR_009527, 31-32)), even though DNR took the position the meeting prep notes was a draft, not a record. (Ex. 8 at DNR_009519.)

As of October 8, 2021, DNR (through Herman) had provided the same 8.4.21 email and draft meeting prep notes to the Friends as Durrant had provided to Hubbuch. (Exs. 8, 12.)

On January 4, 5, and 27, DNR provided additional records responsive to 21PRR8808 to Plaintiff. The 21PRR8808 response is complete. (Carson Decl. ¶ 4.)

**B. Defendants' responses to discovery.**

On December 23, 2021, Plaintiffs submitted their First Request for Interrogatories and First Request for Production of Documents via email.  On January 6, 2022, Plaintiff provided Initial Disclosures. Plaintiff did not identify Hubbuch or 21PRR8841 in these disclosures. (Def. Exhibit A.)

On February 18, 2022, Defendants provided responses to Plaintiff's First Request for Interrogatories and First Request for Production of Documents via email. Defendants then uploaded to Sharefile Bates 000001-011780, related to Defendants' discovery responses. On February 21, 2022, Defendants submitted their supplemental responses to Plaintiff's First Request for Interrogatories and First Request for Production of Documents via email. (Carson Decl. ¶¶ 3, 5-7.)

During the meeting to confer, counsel for Defendants explained the responses to Interrogatories identified as being provided by individuals did not mean that only

those individuals were consulted when preparing a specific response. Rather, when multiple individuals need to aver under oath regarding responses, there must be a process to delineate who is responding to each interrogatory, under oath. (Carson Decl. ¶ 8.)

During the deposition of Diane Milligan on May 11, 2022, counsel for Defendants discovered only a portion of a September 8, 2021 email chain between Vanlanduyt and Durrant may have been provided during discovery and immediately forwarded the entire email. (Carson Decl. ¶ 9, Def. Exhibit B.) Counsel assumed the documents already had been produced, as the Friends marked part of that chain during the Walker deposition. (Ex. 10.) In a case with nearly 12,000 pages/documents provided, a portion of an email chain is not grounds to repeat the voluminous research and necessary review process demanded by Plaintiff. Counsel for Defendant is unaware of any other documents that were not provided. (Carson Decl. ¶ 10.)

On June 22, 2022, as agreed during the meet and confer, Defendants provided supplemental responses to requests for production. (Carson Decl. ¶ 11, Def. Ex. C.)

**C. Defendants' Search Process.**

Upon reviewing the Discovery Requests, it was apparent to DNR Staff Attorney Joe Winandy that the WDNR needed to raise objections to the breadth and scope of the requests. The WDNR has over 3,000 employees and it is not possible to query each employee about each and every conversation they have had with a Friends Group or volunteer over the past five years.  The WDNR does not have the capability to conduct global searches of custodians' email boxes, which means that WDNR IT or

records staff are unable to perform back-end searches of all WDNR employees' email files. Therefore, when responding to public records and discovery the WDNR must rely on identifying the custodians and instructing as to self-searches. (Winandy Decl. ¶ 4.)

The WDNR identified a list of individuals likely to have documents and information responsive to the Friends' Discovery Requests. This list included:

- Diane Brusoe
  Deputy Division Administrator for the Division of Fish, Wildlife, and Parks

- Melissa Vanlanduyt
  Recreation Partnership Section Chief for the Bureau of Parks and Recreation Management

- Steven Schmelzer
  Bureau Director for the Bureau of Parks and Recreation Management

- Keith Warnke (retired)
  Division Administrator for the Division of Fish, Wildlife, and Parks

- Nancy Frost
  Wildlife Biologist for the Bureau of Wildlife Management

- Paul Zajackowski
  District Supervisor for the Bureau of Parks and Recreation Management

- Cheryl Heilman
  General Counsel

- Phillip Rynish
  Property Planning Section Chief for the Bureau of Facilities and Lands

- Daniel Yankowiak
  Recreation Liaison for the Bureau of Parks and Recreation Management

- Brigit Brown
  Recreation Management Section Chief for the Bureau of Parks and Recreation Management

- Brian Hefty
  Deputy Bureau Director for the Bureau of Parks and Recreation Management

- Kevin Swenson
  Natural Resources Property Supervisor for the Bureau of Parks and Recreation Management

- Janet Hutchens
  Coordinator of Friends Groups and Volunteer Services for the Bureau of Parks and Recreation Management

(Winandy Decl. ¶ 5.)

These individuals were selected due to their involvement with Blue Mound State Park, the Bureau of Parks and Recreation Management, and other volunteer groups and activities around the State of Wisconsin. Through the process of preparing responses to Friends' Discovery Requests, additional individuals were added to the list above when identified as potentially having responsive documents and information. Further, upon information and belief, former WDNR Deputy Secretary Todd Ambs was contacted by Cheryl Heilman and provided information but was no longer at the WDNR and did not provide documents. (Winandy Decl. ¶ 6.)

Winandy contacted each individual listed above, with the exception of Todd Ambs, and provided copies of the Discovery Requests along with instructions and explanations as to what types of documents and records were responsive to each request. He also had personal conversations to review the discovery requests and provide further instruction on performing searches and identifying responsive

12

documents, as well as answering any questions. He instructed WDNR staff to search through five years of emails, calendar invites, text messages, personal notes, paper files and computer folders. (Winandy Decl. ¶ 7.)

While Winandy cannot provide an exhaustive list of all search terms used by WDNR staff in conducting their self-searches, he is aware of the following keywords and variations of keywords being used:

- Friends of Blue Mound State Park, Blue Mound, Blue Mounds, Blue Mound State, Blue Mound State Park, BM, BMSP, Blu, FBMSP, Friends of Blue, Friends of Blue Mound, Friends of Blue Mounds, Blue Mound Friends
- Friends of Stower Seven Lakes State Trail
- Sauk Prairie Conservation Alliance
- Friends Agreement,
- Badger Friends
- Termination. Terminate
- Blue Mound State Park Master Plan, Blue Mound Master Plan
- Environmental Assessment, EA
- Snowmobile, Snowmobile Trail, Blue Mound Snowmobile Trail
- State Trails Council, STC, NRTTC, Non-Motorized Trail and Transportation Council

(Winandy Decl. ¶ 8.)

Individuals providing documents saved their documents in a shared folder. This shared folder was used to house documents internally and gave Winandy access to perform an initial review for responsiveness and privilege. Attorney Milligan assisted with a portion of this review. During this review, WDNR also sorted the documents into folders for the responsive interrogatory or request for production of documents. Once the documents were reviewed and sorted, Meg Schaeffer-Utter, a paralegal in the WDNR's Bureau of Legal Services, transferred them to the DOJ ShareFile for bates numbering and eventual production.  (Winandy Decl. ¶ 9.)

Winandy was also involved in preparing narrative responses to interrogatories. This process included conversations with many of the individuals identified above to review conversations and meetings and the topics discussed. He personally reviewed many of these records and can confirm that the WDNR staff diligently searched for responsive records pursuant to his instructions and all non-privileged documents have been produced. WDNR staff are experienced in performing self-searches of their records and apply appropriate and well-crafted keyword searches to identify responsive records.   Given the number of non-responsive documents added to the shared folder, which were filtered out before production, WDNR staff cast a wide net in performing their searches. (Winandy Decl. ¶¶ 10-11.)

Winandy confirms that Defendant Vanlanduyt conducted a diligent and thorough search of her records and documents.   He understands that Vanlanduyt searched all records, emails, text messages, papers, computer files and calendar.  She used a wide range of keywords and variations of keywords, which included:

- Blue
- Blue Mound
- Blue Mound State
- Blue Mound State Park
- BM
- BMSP
- Blu
- FBMSP
- Blue Mound Master Plan
- Friends of Blue
- Friends of Blue Mound
- Friends of Blue Mound State Park
- Blue Mounds
- Friends of Blue Mounds
- STC
- State Trails Council

14

- NRTTC
- Non-Motorized Trail and Transportation Council

Given Vanlanduyt's position as the Recreation Partnership Section Chief for the Bureau of Parks and Recreation Management, terms like "Friends" or "Agreement" do not provide any meaningful filter.  Over a five-year period, Vanlanduyt would have thousands of emails containing those terms because her position deals with Friends groups across the state and agreements of all kinds, not just Friends Agreements. Vanlanduyt is experienced in performing self-searches and has responded to public records requests is a routine activity for her position.  Typically, Vanlanduyt has no knowledge of who is requesting the records, she is provided a list of search parameters from WDNR's public records staff, performs the search, and provides the records.  As such, it was not obvious to Vanlanduyt that there was any connection between the public records requests from Hubbuch (21PRR8841) and the Friends (21PRR8808). (Winandy Decl. ¶ 12.)

Winandy also confirms that Defendant Schmelzer performed a diligent and thorough search of his records and documents. He understands that Schmelzer searched all records, emails, text messages, papers, computer files and calendar. Further, Schmelzer applied a range of keyword searches, including variations on those keywords.  For example, Schmelzer's search included the term "Blue Mound" as well as "Blue Mounds."  Schemlzer repeated this pattern of using keywords and variations on keywords when conducting the entire search. He also performed searches by name, such as "Brusoe" or "Vanlanduyt," and personally reviewed those

records to find any additional documents that did not hit on the keywords used. (Winandy Decl. ¶ 13.)

Plaintiff claims the September 8, 2021 emails at 2:19 and 3:09 between Van Landuyt and Emily Durrant discussing 21PRR8841 were intentionally withheld. (Dkt. 22-7:4-5.) The initial email from Emily Durrant, September 8, 2021 at 12:16 pm, contained an attachment called "Blue Mound." [Carson Decl. Def. Ex. B at 2.] Thus the word "Blue Mound" was present in the 12:16 email.  Winandy believes the reason why the 12:16 email was responsive to the detailed thorough search terms, and the 2:19 and 3:09 emails were not, was because of the way in which emails are stored/saved and the terms that were used. Emails are individual documents, they are not converted to single PDFs in their native form, as they appear in Dkt. 22-7. The searches are looking for terms within each individual email. As discussed, there are problems with searching Vanlanduyt's email for terms as general as "agreement" or "friend." When Vanlanduyt replied to Durrant, (she did not forward the email which means the attachment was lost) the original attachment is no longer attached and there was no longer any reference to Blue Mound in the 2:19 and 3:09 emails. (Def. Ex. B at 2.) And the Hubbuch request never mentioned Blue Mound. (Dkt. 22-7:10-11.) The Friends never mentioned the Hubbuch request until the deposition of Katherine Walker. If Friends had referenced 21PRR8841 in their discovery requests, DNR could have looked at specific PRRs and added search terms related to that PRR.

## ARGUMENT

16

I.   **Plaintiff's Motion to Compel asking the Court to order Defendants to reconduct all searches is unduly burdensome and not proportional to the needs of the case.**

A. **Relevant Law.**

"The importance of protecting parties and non-parties from undue burden is found in various provisions of the Federal Rules of Civil Procedure." *Uppal v. Rosalind Franklin Univ. of Med. & Sci.*, 124 F. Supp. 3d 811, 813 (N.D. Ill. 2015). Rule 26(c)(1) empowers a court to issue an order to protect a party from undue burden or expense. Rule 26(g)(1)(B)(iii) provides that every discovery request must be signed by an attorney of record and that by signing, the attorney certifies that the document is neither unreasonable nor unduly burdensome.

"The discovery rules are not a ticket . . . to an unlimited, never-ending exploration of every conceivable matter that captures an attorney's interest." *Uppal*, 124 F. Supp. 3d at 814 (citing *Vakharia v. Swedish Covenant Hosp.,* No. 90C6548, 1994 WL 75055, *2 (N.D. Ill. March 9, 1994) (unpublished)). "Parties are entitled to a reasonable opportunity to investigate the facts-and no more." *Id.* The Supreme Court has cautioned that the requirement of Rule 26(b)(1) should be firmly applied, and "the district courts should not neglect their power to restrict discovery where 'justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . .'" *Id.* (citing *Herbert v. Lando,* 441 U.S. 153 (1979)); *see also Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 352, 358 (1978)

The Friends demand that the Court order Defendants redo all the careful and thorough work already done by DNR staff, DNR attorneys, and undersigned counsel. This proposed sanction is oppressive, harassing, and unduly burdensome. Further, the cases the Friends relies on for this approach are easily distinguishable from the facts in the present case. In *Govas v. Chalmers*, the defendant served the plaintiffs with the first set of interrogatories and requests for documents. The plaintiffs belatedly served written responses to these discovery requests and then refused for nearly two years to release their documents for defendants' inspection. Throughout this period, EMC sought to compel discovery. Ultimately, the court dismissed the lawsuit for plaintiff's failure to comply after repeated warnings. *Govas v. Chalmers*, 965 F.2d 298, 299 (7th Cir. 1992)

In *Profile Gear Corp v. Foundry Allied Industries Inc.*, the plaintiff Profile Gear repeatedly refused to answer or provided evasive responses to discovery (such as responding "See Complaint" and "See Documents Produced," which the District Court characterized as evasive conduct.) The court imposed a sanction of $250 and ordered the plaintiff to "respond to all outstanding discovery requests by September 25, 1989." *Profile Gear Corp. v. Foundry Allied Industries, Inc.*, 937 F.2d 351, 352 (7th Cir 1991.) At the same time, the plaintiff moved for cross-sanctions and misrepresented to the court an important fact regarding the location of a document review and admitted doing so. The court imposed a second sanction of $250 against the plaintiff's counsel "for pursuing this motion when he knew the representations were not true." Later, the plaintiff was caught in a lie regarding a representation that there were no

responsive documents regarding other disputes regarding the same contract language at issue in the case. *Id.*

In *Novelty, Inc. v. Mountain View Mktg., Inc.*, the plaintiff responded to discovery in batches, for example producing "200 pages of documents plus 60,000 computer files" several months after the initial production. *Novelty, Inc. v. Mountain View Mktg., Inc.*, 265 F.R.D. 370, 377). After that, "Novelty later produced more than 650 pages of additional responsive documents in four waves of disclosures occurring between July 7 and July 22, 2009—well after the deadlines for production had passed." *Id. at 377.* In addition, at a deposition a Novelty Vice President also confirmed that no effort had been made to conduct discovery of their employees in China, who were known to likely have discoverable material *Id. at 378.* Novelty also missed several court-imposed deadlines in discovery orders, which is not an issue in the case before this Court. *Id.* at 380. There is simply no comparison between *Novelty* and the facts before this Court, where one document has been found out of thousands that was inadvertently not flagged for production.

*Boehm* is also not a helpful comparison to this case. *Boehm* concerned a question of claimed work product privilege. The allegations of cherry picking were based on the defendants releasing some emails that would be considered work product that they felt favored their case, while not releasing other work product documents. *Boehm v. Scheels All Sports, Inc.,* No. 15-CV-379-JDP, 2016 WL 6811559, at *3 (W.D. Wis. Nov. 17, 2016). And this was only after defendant insufficiently complied with a prior discovery order from the court. In the original order, the court

actually agreed with the defendant's position that the discovery requests were vague and overbroad, and limited the materials to be produced to only what was relevant to the narrow scope of the underlying copyright infringement claim. *Boehm v. Scheels all Sports, Inc.*, No. 15-CV-379-JDP, 2016 WL 6462213, at \*2 (W.D. Wis. Nov. 1, 2016) (Plaintiffs' first request for materials related to items Thomason sold online is vague and overbroad. The court will narrow this request to all records, including posted photographs, of Thomason's online sales of sports photos. This narrowed request is relevant to the extent of Thomason's infringement.) And while the order does compel the production of certain documents, as can occur in requests to compel discovery, nothing in the *Boehm* order requires the defendants to "reconduct" an entire search. *Id.*

While Friends argues there is an inequality of resources in this litigation that benefits the DNR, this is demonstrably false. The Court need look no further than the signatures on Plaintiff's brief showing no fewer than *seven* attorneys worked on the discovery motion on behalf of the Plaintiff.

## B. Defendants conducted careful and thorough searches in response to Plaintiff's Written Discovery.

Plaintiff's Discovery Requests were extremely broad and onerous as served upon Defendants and objections to the breadth and scope of the requests was timely raised. The Plaintiff defined "you" as the DNR and its employees.  (Dkt. 22-1 at 3.) DNR has over 3,000 employees meaning it is impossible to ask each employee about every conversation they have had with a Friends Group or volunteer over the past five years.  DNR does not have the capability to conduct global searches of custodians'

20

email boxes, which means that IT or records staff are unable to perform back-end searches of all employees' email files. Therefore, when responding to public records and discovery the DNR must rely on identifying the custodians and instructing as to self-searches. Thus, Defendants narrowed down the list to 13 individuals who were likely to have documents and information responsive to the Friends' Discovery Requests. Those individuals conducted broad, thorough searches using search terms likely to gather responsive documents, variations on all of those search terms, as well as many combinations of commonly-used abbreviations. These individuals followed the Friends' instructions to search back five years. Responsive documents were then uploaded for review by DNR staff attorneys for relevance and privilege. Based on the large number of non-responsive documents provided, DNR staff attorneys are confident the searches were sufficiently broad and covered the appropriate time frames.

The Friends now point to two emails, that allegedly should have been found during the initial search, as a reason to order Defendants to conduct a do-over of the voluminous discovery already undertaken in this case. In a large discovery response, it is not unusual to supplement. Parties are required to supplement if additional information or documents are located during the discovery phase of civil litigation. Here, we are talking about missing 0.0017% of relevant documents--two pages out of nearly 12,000 (2/11,780 = .00017).  As soon as counsel learned Plaintiff might not have those two pages based on the questioning of Milligan, she immediately forwarded those pages. That certainly is not evidence of any intent to deceive or

withhold. These missing two pages and counsel's immediate response to that realization provide no legitimate support for the relief demanded by Plaintiff in its motion to compel. Plaintiff has not and cannot provide any caselaw where a court ordered Defendants to re-do a huge amount of discovery because two pages were missing from an initial production and immediately supplemented. *See* Section IA, *supra*.

At bottom, Defendants identified DNR employees who had relevant documents, searched, reviewed and winnowed out thousands of non-responsive documents, matched responsive documents up to the interrogatory and/or RPD number, produced in corresponding folders, and provided a detailed privilege log. Defendants timely produced thousands of well-organized documents within the time agreed upon to respond. There are simply no grounds to order Defendants to repeat all of this work. *See Uppal*, 124 F. Supp. 3d at 814.

### C. Durrant's responses to 21PRR8808 and 21PRR8841 are not evidence of any attempt to prevent the Friends' access to documents nor malfeasance on the part of Defendants.

Durrant reviewed and decided what documents to produce in response to 21PRR8808 and 21PRR8841. It defies common sense that Durrant and Defendants attempted to "hide" documents by producing them to a newspaper reporter. The single email that Durrant overlooked when responding to 21PRR8808 does not suggest the pattern the Friends suggest that it does. Durrant testified as to what happened, she made a mistake. Furthermore, Vanlanduyt's response to Durrant's questions about whether the draft meeting prep notes were used at the meeting or if

a final version was created were truthful. The Friends may disagree with Defendants' interpretation of what constitutes a draft under the public records law, but that is a legal question. This disagreement does not call into question the sincerity of Vanlanduyt's answers to Durrant's questions and her reliance on DNR public record guidance. Vanlanduyt gave the exact same response to Durrant when asked about both the 21PRR8808 and 21PRR8841 requests. (Exs. 3, 10, 58.)

Pursuant to public records law, "drafts" do not qualify as and need not be disclosed pursuant to a public records request. Records are defined as follows:

> "Record" means any material on which written, drawn, printed, spoken, visual, or electromagnetic information or electronically generated or stored data is recorded or preserved, regardless of physical form or characteristics, that has been created or is being kept by an authority. "Record" includes, but is not limited to, handwritten, typed, or printed pages, maps, charts, photographs, films, recordings, tapes, optical discs, and any other medium on which electronically generated or stored data is recorded or preserved. **"Record" does not include drafts, notes, preliminary computations, and like materials prepared for the originator's personal use or prepared by the originator in the name of a person for whom the originator is working**; materials that are purely the personal property of the custodian and have no relation to his or her office; materials to which access is limited by copyright, patent, or bequest; and published materials in the possession of an authority other than a public library that are available for sale, or that are available for inspection at a public library.

Wis. Stat. § 19.32(2)(emphasis added). Specifically, in *Schill v. Wisconsin Rapids School Dist.*, the court stated as follows:

> The School District also relies on *Fox v. Bock*, 149 Wis.2d 403, 408, 417, 438 N.W.2d 589 (1989), for the proposition that once a draft or preliminary computation is circulated or used by others, it becomes a record under the Public Records Law. The *Fox* court held that regardless of whether the document was labeled a draft, once a government entity had begun taking official actions based on the document's suggestions, the document became a record. The *Fox* court refused to allow the label of "draft" to exclude the document from the Public Records Law. That

the report "aroused official action" indicated that the "draft" was for government, not personal, use, declared the *Fox* court, 149 Wis.2d at 417, 438 N.W.2d 589.

*Schill v. Wisconsin Rapids School Dist.*, 2010 WI 86, ¶ 71, 327 Wis. 2d 572, 786 N.W.2d 177.

Durrant questioned Vanlanduyt on her use of the draft meeting prep notes. Vanlanduyt responded that she had not created a final version nor used the document marked draft during the August 5, 2021 meeting. Most notably, Vanlanduyt does not even know who is making a request for records. She provides records and answers any followup questions. Based on Vanlanduyt's representations and training from the DNR, Durrant determined that the meeting notes was not a record. In responding to 21PRR8841, Durrant intended to produce the August 4, 2021 Vanlanduyt email only and produced, by mistake, the draft meeting notes imbedded in the email attachment to Hubbuch. When responding to 21PRR8808, Durrant again intended to produce only the August 4, 2021 email.

The Friends have provided nothing other than speculation as to what happened or why. That speculation is not grounds to order Defendants to reconduct searches that led to the production of nearly 12,000 pages of documents. Regardless, there is no dispute that the Friends received the documents at issue directly from DNR on October 8, 2021, even though DNR took the position that the meeting prep notes was a draft and did not qualify as a record.

**D. Supplemental Responses were provided on June 22, 2022.**

Plaintiff alleges that adequate responses regarding RPD 5 and 6 have not been provided to date. (Dkt 23:7). Regarding RPD 5, following the meet and confer on April 20, 2022, Friends' Counsel submitted a list of three other groups it was requesting documents regarding on May 9, 2022. (Dkt 22. ¶ 9; Pl. Ex. E). After reviewing the request, it was determined that no supplement was needed for these three groups. RPD 5 sought documents "relating to the termination of, or failure to extend, any Friends Group agreement." (Dkt 22; Pl. Ex. A at 8.) Of the three groups, only the Friends of Potawatomi State Park were an official NR 1.71 Friends Group, and they were an active group and had not been terminated. The other two groups were not NR. 1.71 groups and therefore RPD 5 did not apply to them. Plaintiff's brief omits that a supplemental response explaining the above was provided on June 22, 2022, including further details on why this request was being objected to (Def. Ex. C.)

Regarding RPD 6, the Defendants reassert their objections. RPD 6 seeks "Produce all internal and external Documents and Communications … in Your possession or control between any WDNR employee and … any other non-profit organizations that have initiated litigation against the WDNR." (Dkt 22; Pl. Ex. A, 8) The Defendants objected, stating that "Defendants object on the grounds that this Request is overly broad, unduly burdensome, is not proportional to the needs of the case and calls for information protected by the attorney client and/or work product privileges. Defendants further object on the grounds that this Request is overly broad and unduly burdensome due to the number of DNR staff and volume of litigation in which the Department has been involved." (Dkt 22; Pl. Ex. B at 5) This objection still

stands. The plaintiff is requesting potentially thousands of documents from people and groups who are not part of the lawsuit before this Court, without regard to privilege, relevancy, or the needs proportional to this case.

Plaintiff's request also encompasses many publicly available documents, such as the filings on other cases involving the DNR and other friends groups. Rather than asking the DNR to provide entire case files of information of potentially no relevance, the Plaintiff could directly access whatever information that they believe to be relevant from the publicly available filings without requiring the DNR to act as a pass through. Accordingly, the Defendants also request that the Court sustain the Defendants' objections to RPD 6 pursuant to Fed. R. Civ. P. 26(b)(2)(C)(i), as "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive."

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court deny Plaintiff's Motion to Compel.

Dated: July 14, 2022.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

s/Gesina S. Carson
GESINA SEILER CARSON
Assistant Attorney General
State Bar # 1055162

BEAUREGARD W. PATTERSON
Assistant Attorney General

State Bar #1102842

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608)266-1672(Carson)
(608) 264-9488(Patterson)
(608) 294-2907 (Fax)
carsongs@doj.state.wi.us
pattersonbw@doj.state.wi.us